*401
 
 Mr. Justice DAVIS
 

 delivered the opinion of the court.
 

 It is unnecessary, for the purposes of this suit, to consider whether, on general principles, the middle of the channel of a navigable river which divides coterminous States, is not the true boundary between them, in the absence of express agreement to the contrary, because the treaty between France, Spain, and England, in February, 1763, stipulated that the middle of the River Mississippi should be the boundai’y between the British and the French territories on the continent of North America. And this line, established by the only sovereign powers at the time interested in the subject, has remained ever since as they settled it. It was recognized by the treaty of péace with Great Britain of 1783, and by different treaties since then, the last of which resulted in the acquisition of the territory of Louisiana (embracing the couutry west of the Mississippi)-by the United States in 1803. The boundaries of Missouri, when she was admitted into the Union as a State in 1820, were fixed on this basis, as were those of Arkansas in 1836.
 
 *
 
 And Kentucky succeeded, in 1792,
 
 †
 
 to the ancient right and possession of Virginia, which extended, by virtue of these treaties, to the middle of the bed of the Mississippi River. It follows, therefore, that if Wolf Island, in 1763, or in 1820, or at any intermediate period between these dates, was east of this line, the jurisdiction of Kentucky rightfully attached to it. If the river has subsequently turned its course, and now runs east of the island, the status of the parties to this controversy is not altered by it, for the channel which the river abandoned remains, as before, the boundary between the States and the island does not, in consequence of this action of the water, change its owner.
 
 ‡
 

 That Virginia claimed the ownership of the island as early as 1782 is very certain, for at that date the arable laud on it was entered in the proper office of Virginia as vacant laud lying within the territorial limits of the State, although it
 
 *402
 
 seems the entry was never surveyed or carried into a grant. And that Kentucky is now, and has been for many years prior to the commencement of this suit, in the actual and exclusive possession of the island, exercising the rights of sovereignty over it, is beyond dispute. The island lies opposite to, and forms part of, Hickman County, one of the counties of the State, and the lands embraced in it were, in May, 1837, surveyed under State authority, and have since then been sold and conveyed to the purchasers by the same authority. The people residing on it have paid taxes and exercised the elective franchise according to the laws of the State. In 1851, a resident of the island was elected to represent the county in the General Assembly, and served in that capacity. And as early as 1828, a minor living there with one Samuel Scott, was bound an apprentice to him by the proper court having jurisdiction of such subjects. This possession, fully established by acts like these, has never been disturbed. If Missouri has claimed the island to be within her boundaries, she has made no attempt to subject the people living there to her laws, or to require of them the performance of any duty belonging to the citizens of a State. Nor has there been any effort on her'part to occupy the island, or to exercise jurisdiction over it. If there were proof that the island, by legislation, had been included in the limits of New Madrid County, then the service of a writ in 1820, on the solitary settler there, by the sheriff of the county, would be an exercise of sovereign power on the part of the State. But in the absence of this proof, there is nothing to connect the State with the transaction, or from which an inference can be drawn that the sheriff'was authorized to go on the island with his process. And for the same reason, it is hard to see how the fact, conceding it to be true, that a person occupying the position of a circuit judge of Missouri, once lived on the island (when or how long we are not informed), tends to show that the State intended to take possession of it.
 

 These things may prove that, in the opinion of the judge and sheriff, the island belonged to Missouri, but they do not
 
 *403
 
 go further and put the State in any better position than she was, if they had not occurred. And so with the locator of the New Madrid claim in 1821. He doubtless believed he had authority to locate his warrant on the island, but surely the State cannot claim that she acquired any right by this proceeding. There is, therefore, nothing in this record which shows that Kentucky has not maintained, for a long course of years, exclusive possession and jurisdiction over this territory and the people who inhabit it. It remains to be seen whether she shall remain in possession and continue to exercise this jurisdiction, or whether she shall give way to Missouri. The ease is certainly not without its difficulties, but we think these difficulties can be removed by a fair examination of the testimony, and the right of the contestants properly determined.
 

 The evidence to be considered consists of the testimony of living witnesses, the physical changes and indications at and above the island, and the maps and books produced by the complainant. In a controversy of this nature, where State pride is more or less involved, it is hardly to be expected that the witnesses would all agree in their testimony. And as this conflict does exist, it is necessary to consider the evidence somewhat in detail, in order to justify the conclusions we have reached concerning it.
 

 There are eight witnesses called for the complainant, who testify confidently, that the main channel of the Mississippi River was always east of "Wolf Island, and one of them (Swon), an experienced river-man, who navigated the river from 1821 to 1851, in all stages of water, says there are no indications that the main channel was ever on the west side. Only three of them knew the river prior to 1820, and they were engaged in the business of flat-boating, which is hardly ever undertaken in a low stage of water. There is nothing to show that any one of them ever made a personal examination of the channels and surrounding objects at this point, and there is a remarkable absence of facts to sustain their opinions. It is also noticeable, in connection with this evidence, that none of the witnesses (Hunter may be an excep
 
 *404
 
 tion) ever lived in the vicinity of the island, or remained there any length of time, and that all the knowledge any of them acquired of the state of the river was obtained by passing up or down it at differént times, either on flatboats or steamboats. Notwithstanding they swear positively that the channel was always east of the island, yet Watson says it changed for about three years, and Banney testifies that on one occasion, when the main channel vras divided into three parts, the deepest water for a short time in the fall of the year was found on the west of the island, and-steamboats passed on that side. But they do not prove a deficiency of water at any time in the Missouri channel, or that any boat, from that or any other cause, was ever hindered in an}' attempt to run it. It is undoubtedly true that the Kentucky channel, when the 'river was full, for many years has afforded a safe passage for boats, because at such a time, if the obstructions were not submerged they could be avoided, and navigators would take it as it was five miles the shortest. And passing the river only occasionally, and without any knowledge of where the volume of water flowed when the river was low, they would naturally conclude it was the main channel. It is equally true that now it is the main highway for the business of the river; but the point to be determined is, was it so as far back as 1763, or even 1820 ? If in the investigation of such an inquiry, positive certainty is not attainable, yet the evidence furnished by the defendant aflbrds a reasonable solution of it. And, at any rate, it greatly outweighs the evidence on the other side, and in such a case the party in possession has the better right. The proof on behalf of the defendant consists of the testimony of twenty-seven witnesses. Many of them have been acquainted with the river from an early period in this century, and quite a number have spent their lives near the disputed territory, and, therefore, had better opportunities for observing the condition of the river at this point than the witnesses for the complainant, who only passed there occasionally. Nearly all of them are old men, and there is no diversity of opinion between them concerning the loca
 
 *405
 
 tion of the main channel of the Mississippi River at Wolf Island. All who testify on the subject — there are only a few who do not — agree that until a comparatively recent period it ran west of the island, and to fortify their opinions they describe the state of the respective channels at different times, and tell what was done by themselves or others about the navigation of the river. They concur in saying that in early times it was difficult for fiatboats, even in the highest stage of water, to get into the Kentucky chute, owing to the current running towards the Missouri side, and that if they succeeded in doing it, the navigation was obstructed on account of the narrow and crooked condition of the stream, which was filled with tow-heads, .sand-bars, driftwood, and rack-heaps. One of the witnesses, in describing the appearance of this chute in 1804, states that it looked like lowlands, with cottonwood and cypress on it, and that there was only a narrow channel close to the island; all the other space to the Kentucky shore, now open water, was then covered with large cottonwood timber.
 

 Other witnesses corroborate this testimony, and unite in saying that in early times, at an ordinary stage of water, it w7as impossible to take the Kentucky channel at all, on account of these obstructions, while the Missouri channel was wide, deep, and unobstructed. And one of them expresses the opinion that in low water, any one could have got to the island from the Kentucky shore without wetting his feet, by crossing the small streams on the drift-wood. But we are not left to conjecture on this point, for Ramsey, an old inhabitant of the country, swears that on one occasion he walked over from the Kentucky side to the island, nearly all the way on dry land, and the residue on drift-wood, and noticed while on the island, that there was plenty of water in the Missouri channel.
 

 Can it be possible that such a stream at this time was the main channel of the Mississippi River? Although the Kentucky channel, from natural causes, had improved in 1825, still iu the low water of that year it did not have a depth of over two and a half feet nor a width exceeding one bun
 
 *406
 
 dred and fifty yards, while steamboats passed through the Missouri channel without any difficulty. The witness who testifies to this state of things, at that time, had his attention especially called to the subject as he kept a woodyard on the Kentucky side opposite the island, and missed the opportunity of supplying boats that ran the Missouri channel.
 

 And there is no one who speaks of a scarcity of water in the Missouri channel, until after Captain Shreve operated in this locality with his snag-boats, which had the efteot of opening and deepening the Kentucky channel, so that it has now become the navigable stream. Judge Underwood says that in 1820 the west channel was between four and five hundred yards wider than the, east one,.and must have discharged nearly double the quantity of water. And one witness testifies that the east channel was formerly so narrow that two steamers could not pass in it abreast. It would seem, therefore, that the condition of this channel, as told by these witnesses, was proof enough that the main channel was west of the island; but this is not all the proof on the subject. Russell, who was appointed superintendent of river improvements in 1842, and knew the island since 1814, and spent five months there in 1819, swears that in descending the river in 1830 or 1831 he squnded the Kentucky channel, and, not finding water enough in it by two or three feet to float his boat, was compelled to go down on the Missouri side, where there was nine or ten feet of water. To the same effect is the evidence of Holton, who, in 1828, being unable to get up the east channel with a steamer drawing upwards of six feet of water, went over to the Missouri side and passed through without any trouble. And, three years later, Peebles saw three or four steamers attempt to run up the Kentucky channel, and failing to get through, back out and easily ascend the other. Christopher, who ran the river from 1824 to 1861, on one occasion could not pass the bar at the foot of the Kentucky chute with a boat drawing twelve feet of water, and was compelled to change to the other side, and got up without any difficulty; and there are other witnesses who testify to the inability of boats to
 
 *407
 
 pass east of the island, and to their safe passage west of it. Indeed, the concurrent testimony of all the persons engaged in the navigation of the river is, that they could never safely go east of the island, unless in high water, and that they uniformly took the west channel in dry seasons; and the flatboatmen, in early times, even in high water, wei’e frequently compelled to uncouple their, boats in order to descend the Kentucky channel, and then were obliged to pull through by trees, on account of the narrowness of the channel. In low water they would quite often get aground and have to wait for a rise of the river to take them out. It will readily be seen that this class of men would naturally take risks in order to save five miles of navigation. Moseby, who has lived in the vicinity for forty-two years, testifies to the greater volume of water in the Missouri channel, and to boats usually taking it; and all the witnesses agree that since they knew the river the chutes around the island have undergone great changes, and that the east one is now, in depth, width, and freedom from obstructions, wholly unlike what it was formerly. In this state of proof, how can it be successfully contended that Missouri has any just claim to the island ?
 

 But there is additional proof growing out of certain physical facts connected with this locality which we will proceed to consider. Islands are formed in the Mississippi River by accretions produced by the deposit at a particular place of the soil and sand constantly floating in it, and by the river cutting a new channel through the mainland on one or the other of its shores. The inquiry naturally suggests itself, of which class is Wolf Island? If the latter, then the further inquiry, whether it was detached from Missouri or Kentucky. The evidence applicable to this subject tends strongly to show that the island is not the result of accretions, but was once a part of the mainland of Kentucky. Islands formed by accretions are, in river phraseology, called made land, while those produced by the other process necessarily are of primitive formation. It is easy to distinguish them on account of the difference in their soil and timber.
 

 
 *408
 
 It has been found, by observation and experience, that primitive soil produces trees chiefly of the hard-wood varieties, while the timber growing on land of secondary formation — the effect of accretions — is principally cottonwood. Wolf Island is of large area, containing about fifteen thousand acres of land, and, with the exception of some narrow accretions on its shores, is primitive land, and has the primitive forest growing on it.
 

 On the high land of the island there are the largest poplar, chineapin, oak, and black-jack trees growing, and primitive soil only has the constituent elements to produce such timber. But this is not all, for trees of like kind and size are found on the Kentucky side on what is called the second bottom, near the foot of the Iron Banks, which is about two feet higher than the bottom on which Columbus is located. There are no such trees on the Missouri shore. Those found there'are of a different kind and much smaller growth. Besides this, the high land on the island is on the same level wit]} the second bottom on the Kentucky side, while it is four or five feet higher than the land on the Missouri side opposite the island and above it. In this state of the case, it would seem clear that this second bottom and island were once parts of the same table of laud, and, at some remote period, were separated by the formation of the east channel. In the nature of things, it is impossible to tell when this occurred, nor is it necessary to decide that question, for, by the memory of living witnesses, we are enabled to determine that the east channel, or cut-off, as it should be called, was not the main channel down to 1820.
 

 If the testimony already noticed be not enough to prove this, there is the additional evidence furnished by the changes which the river has accomplished in the neighborhood of the island, within the recollection of many intelligent persons. These changes are important, and are shown ou the map of H. Gr. Black (on the opposite page), which is proved to be a correct representation both of the present and original position of the island, the river, and its banks. The effect of the evidence on this subject is, that the filling
 
 *410
 
 up at the mouth of Town Creek, the washing away of the point above on the Missouri side, the abrasion of the Iron ' Banks, and the partial destruction of Toney’s Point, have operated to straighten the banks above the island on the Kentucky side, to bring the water closer to them, and, as a consequence, to cast it into the east channel. And that, before these projecting points were removed, and the accretions made at Town Creek, the water was thrown towards - the Missouri side. This was necessarily so, as can readily be seen by an inspection of the map. In.the original condition of the river the current must have been carried from the Missouri point to the Iron Banks opposite, and rebounded from them across to the Missouri side, so as to carry the channel west of Wolf Island. And.it is equally clear that the changes which have occurred within this century have straightened the river and turned the channel to the east of the island. Can there be any need of further evidence to sustain the long-continued possession of Kentuckv to the island, and are not the witnesses, who swear that in their time the main channel of the Mississippi Biver ran west of Wolf Island, abundantly fortified?
 

 
 *409
 

 
 *410
 
 But it is said, the maps of the early explorers of the river and the reports of travellers, prove the channel always to have been east of the island. The answer to this is, that evidence of this character is mere hearsay as to facts within the memory of witnesses, and if this consideration does not exclude all the books and maps since 1800, it certainly renders them of little value in the determination of the question in dispute. If such evidence differs from that of living witnesses, based on facts, the latter is to be preferred. Can there be a doubt that it would be wrong in principle, to dispossess a party of property on the mere statements — not sworn to — of travellers and explorers, when living witnesses, testifying under oath and subject to cross-examination, and the physical facts of the case, contradict them ?
 

 But, it is claimed the books and maps which antedate human testimony", establish the right of Missouri to this island. If this be so, there is recent authority for saying they are
 
 *411
 
 unreliable. In 1861 Captain Humphreys and Lieutenant Abbott, of the corps of Topographical Engineers, submitted to the proper bureau of the War Department, a report based on actual surveys and investigations, upon the physics and hydraulics of the Mississippi Hi ver, which they were directed to make by Congress. In speaking on the subject of the changes in the river,
 
 *
 
 they say : “ These changes have been constantly going on since the settlement of the country, but the old maps and records are so defective, that it is impossible to determine much about those which occurred prior to 1800.” Iu the face of this report, authorized by the government, and prepared with great learning and industry, how can we allow the hooks and maps published prior to this, century, to have any weight in the decision of this controversy ?•
 

 Without pursuing the investigation further, on full consideration of all the evidence in the case, we are satisfied the State of Missouri has no just claim to the possession of Wolf Island.
 

 It is therefore ordered that the bill be
 

 Dismissed.
 

 *
 

 3 Stat. at Large, 545; 5 Id. p. 50.
 

 †
 

 1 Id. 189.
 

 ‡
 

 Heffler, Du Droit International, p. 143, § 66; Caratheodéry, Du Droit International, 62.
 

 *
 

 Page 104.