Nicholson, C. J.,
delivered the opinion of the court.
This is an action of ejectment involving the title of an island in the Mississippi river, known as Den-ham’s or Cut-off Island. Plaintiff claims title under a *285 'gi'ant 'from the ‘State of Tenifei^gee, dated in 1867. Defendant claims under a grant from- North Carolina, dated ind 1788. The questions in the case arise upon the '-ftrfkflving facts,'about which there is no contest. The grant to Martin Armstrong, under which defendant claims, dated in 1788, describes the land as follows: A tract of land containing five thousand acres, lying and being in the western district, dying on the Obion river about one mile above the mouth of said river; beginning at a pecan, sycamore and hoop ash, marked I and E, on the north bank of said river, five chains above a lake, Armstrong^ corner, runs south 160 chains to a cypress, thence east 312J chains to a stake, thence north 160 chains to an ash — Armstrong’s line — to the beginning. The beginning corner of the grant is identified and fixed ' by the - proof, but neither of the other corners is identified, nor is it shown that any of 'the lines were ever run or marked. On the contrary, the proof makes. it reasonably certain that none of the lines were ever .run or marked. It is shown that the Mississippi, in its southerly course, made a bend to the east about the point where the Obion river entered it, and that after circling around for about sixteen miles it returned to a point about half a' mile from that where it deflected from its southern course, and then pursued its southerly course.' In 1788, and down to 1822 or 1823, this circular bend was the main channel of the river, and-'if the grant had been run out in 1788 nearly the entire tract embraced within its boundaries would have been west of the main channel of the river, and *286 consequently in territory ■which then belonged 4o the government of Spain. It is further shown, that in. 1822 or 1823, in consequence of a sudden avulsion, the river broke through the half mile before referred to, deserted its former channel around the circular bond, and that from about that time, at least since 1826, the main channel of the stream has been through the half mile of cut-off. The island thus formed has since been known as Cut-off Island, or Denham’s Island, from the name of the first man who navigated the cut-off. The proof is abundant that since 1826 the channel of the river has been along the cut-off.
In 1788, when the grant issued to Martin Armstrong, the territory on the west bank of the Mississippi river belonged to Spain, and her line was in the center of the main channel. This line was along the thread of the circular bend, which was the main channel of the river. It follows that, according to the calls of the grant, the land granted by North Carolina to Martin Armstrong in 1788 was the property of the Spanish government, and not the property of North Carolina. The grant was therefore a nullity. Polk’s Lessee v. Wendal, 9 Cranch, 99.
It does not appear from the record that anything was done except the issuance of the grant in 1788 by North Carolina, to perfect the title'to the grantee; nor could anything be done, because, in 1789, she ceded her western terriotry to the United States, and after that time, and after the Act of 1803, ceding to Tennessee the right to issue grants, the State of North Carolina parted with her right to issue grants for lands *287 within the State of Tennessee, upon entries made before the cession. Burton v. Williams, 3 Wheat, 529; 11 Peters, 210.
It follows that defendant has no title to the land in controversy by virtue of his - claim under the Martin Armstrong grant, issued in 1788. But the plaintiff ' must recover, if at all, on the strength of his title, and as the defendant is in possession, he has the right to keep that possession if he has shown in any other party “a present, subsisting, legal and bona fide title, not one abandoned by the parties, or barred by the statute of limitations. Peck v. Carmichel, 9 Yer., 325; Dickman v Collins, 1 Swan, 516. It is necessary, therefore, to examine the title of the plaintiff, in view of the charge' of the Circuit Judge, which was as follows; “The principal question to be determined by the jury is, as to whether the territory upon which the land is situated belonged to the State of North Carolina at the time the Armstrong grant issued. If the jury should find that the State of North Carolina assumed the sovereignty and control of the island at the issuance of the grant, and subsequently Tennessee, under the - cession Act, asserted like control over the island, both States assuming the sovereignty and control of the territory, to the exclusion of all others, States or Nations, for a period of twenty years,- the legal presumption, would be that the island originally belonged to North- Carolina, and at the expiration of from thirty to fifty years, the presumption would be conclusive upon the parties to this contest. That the jury might look to, the facts that North Car *288 olina and Tennessee caused lands to be surveyed and granted by their public officers upon the island; caused court processes by her officers to issue, both in favor of and against the citizens of the island, as circumstances going to show that the States of Tennessee and North Carolina asserted their sovereignty over the territory.”
We might content ourselves by resting our decision upon the latter portion of this extract from the charge, in which the Judge assumes that certain facts existed, and then proceeds to instruct the jury that these facts were calculated to establish certain legal results- which would be conclusive of the case. It was the province of the jury, and not of the court, to determine whether the facts enumerated by the Judge were proven or not. If proven, the Judge might ■ correctly instruct the jury as to the legal consequences that would follow.
But as this error may not reach the merits of the case, we deem it proper to examine the legal propositions contained in the preceding portion of the charge. The leading idea in the charge is, that if North Carolina and Tennessee exercised sovereignty and control over the island for a period of twenty years, the legal presumption would be that the island originally belonged to North Carolina. To make the legal presumption effectual, the exercise of sovereignty and control for twenty years by both States must be calculated. But the grant issued to Armstrong in 1788, and in 1789 North Carolina ceded the territory to the United States, and in 1796 the United States admitted *289 the ceded territory into the Union as the State of Tennessee. The only act of control or sovereignty on the part of North Carolina, was the act of issuing a grant one year before she ceded her Avestern territory to the United States. This single act, therefore, was all the evidence of exercise of sovereignty or control by North Carolina to which the charge could have reference. But Ave have already seen that North Carolina had no title to the island in 1788, but the title Avas in the Spanish government, and therefore that the grant Avas an absolute nullity. It is impossible to comprehend Iioav an act of sovereignty, that is in itself a violation of the rights of another sovereignty, and therefore void, can be so united with the acts of sovereignty and control by Tennessee, Avhich occurred more than thirty years afterwards, as to relate back to, and make good, a title originally null and void. The title to the lands in Tennessee south and west of the Congressional reservation line continued in the United States until-’ 1841, - when the State was empowered, as agent, to make titles, and it was not until 1846 that the United States finally relin-guished her title to the State. • In no view, therefore, could the acts of sovereignty and control by Tennessee, enumerated by the Judge, have any significance of force until after the sovereignty of the territory was vested in her by the act of relinquishment by Congress in 1846. And whe,n Tennessee did exercise acts of sovereignty and control over the island, it Avas not by virtue of, or under title she derived from North Carolina, nor by Avay of recognizing or ratifying any *290 title that North Carolina had ever asserted to the island, but all her acts of control and of jurisdiction were in subordination to the title of the United States until 1846, and after that period by virtue of the title derived from the United States. The whole theory of the charge is therefore erroneous, and is unsustained by the facts in proof. The rule as to presumptions of grants between individuals can have no application to sovereign States or Nations, and, therefore, the title to the land in controversy must rest on other grounds. Lindsey v. Miller, 6 Peters, 666; 3 Wash., Real Prop., 141, and cases cited.
We have seen that in 1788, when the grant, issued to Armstrong, the land in controversy was west of the Mississippi river and therefore the property of Spain. By the treaty of 1763, between France, Spain and England, the middle of the Mississippi river was made the dividing line between the British and the French Territories on this continent. This line was recognized by the treaty of peace with Great Britain in 1783, and by the different treaties since then, the last of which, 1803, resulted in the acquisition of the territory of Louisiana by the United States. It follows that when the United States, in 1803, acquired the title to the French territory west of the Mississippi they became vested with the title to the middle of that river, and therefore with the title to the Cutoff Island, which at that time, and down to 1822 or 1823, was on the west side of the river. The change in the channel of the river in 1822 or 1823 does not alter the status of the title, for the channel which *291 the river abandoned remains, as before, the boundary between the parties on the opposite sides of the river, and the island does not, in consequence of this action of the waters, change its owner. Missouri v. Kentucky, 11 Wall., 401.
It follows that the title -to to the island is outstanding in the United States, unless by some act of the United States the title has either been conveyed or relinquished, so that it is not now a present, subsisting, bona fide title. As the plaintiff claims under a grant from the State of Tennessee, it is incumbent on him to show that the State could rightfully communicate to him a valid title.
We have seen, that by the treaty of 1803, the United States was vested with the title to the lands West of the Mississippi river, including the island in controversy. By the deed of cession by North Carolina, in 1789, the United States was vested with the title to the lands East of the .river. ’ So that by operation of the treaty and the deed of cession, the United States became the owner of the land on both' sides of the river.
By the act of Congress of 1836, the State of Arkansas was admitted into the Union, with the following boundaries: Beginning in the middle of the main channel of the Mississippi river, on the parallel of 36. degrees North latituderunning thence West with said parallel of latitude, to the St. Francis river; thence up the middle of the main channel of said river to the parallel of thirty-six degrees and thirty minutes North; from thence West to the South-west *292 corner of the State of Missouri; and from thence to be hounded on. the West to the North bank of Red river, by the lines described in the first articles of the treaty between the United States and the Cherokee nation of Indians, West of the Mississippi, etc.; and to be bounded on the South side of Red river by the Mexican boundary line, to the North-west corner of the State of Louisiana; thence East with the Louisiana State line to the middle of the main channel of the Mississippi river; thence up the middle of the main channel of the said river to the thirty-sixth degree of North latitude, the point of beginning.
It is observed that in these boundaries no reference is made to the original boundaries of the Louisiana Territory as described in the treaty of 1803, but the United States relinquishes to the State of Arkansas all title to the lands, making the middle of the main channel of the Mississippi river the Eastern boundary of the State. It has already appeared that for at least ten years before the passage of the act of 1836, the main channel of the Mississippi river was through the cut-off which placed the island on the East side of the river. It is, therefore, manifest that there is no outstanding title to the island in the State of Arkansas, but the title thereto, continued in the United States,"" as before the act of 1836.
The remaining question is, does the title to the island still continue in the United States, or has it passed by any act of. the United States to the State of Tennessee ? The United States obtained title to the Western Ter *293 ritory of North Carolina by' the cession of 1789, burthened with various terms and conditions, in respect to the satisfaction of exisiting rights created by entries and military warrants. But as' the island in controversy was not acquired from North Carolina by the cession of 1789, her title was not encumbered with any of these terms and conditions. The title was derived from France, and was' absolute and unencumbered.
By an act of Congress of 1806, the line known as the congressional reservation line was defined, and by this act all the lands North and East of this line were ceded to the State of Tennessee, and the lands South and West of this line were to remain at the sole and entire disposition of the United States, the State agreeing to relinquish all right, title and claim thereto.
By an act of Congress of 1818, the State of Tennessee was authorized to issue grants and perfect titles on all special" entries and locations of lands, made pursuant to the laws of North Carolina before the 25th of February, 1790, which- were good and valid in law, and recognized by the cession act passed in 1789, and which lie South and West of the Congressional reservation line. It is seen that this act has special reference to the territory acquired by the United States from North Carolina, and therefore could in no way affect the title to the island, which then was on the West side of the Mississippi river. Down to this period, the United States had taken no steps for the disposition of the lands South and West of *294 the Congressional reservation line, except as provided in the act of 1818. But in 1841, an act was passed by Congress “that the State of Tennessee be, and is hereby constituted the agent of the Government of the United States, with full poyer and authority to sell and dispose of the vacant, unappropriated and refuse lands within the limits of said State, lying South and West of the line commonly called the Congressional reservation line.” This agency was coupled' with the trust of satisfying all legal and bona fide claims of North Carolina, upon said lands.
In 1846, Congress passed an act by which “the United States hereby release, and surrender to the State of Tennessee, the right- and title of the United States to all lands in the State of Tennessee lying South and West of the Congressional reservation line in said State, which may yet remain unappropriated; with this proviso: that all the said lands the release of which -is herein provided for, and the proceeds thereof, shall be and remain subject to' all the same claims, incumbrances and liabilities in relation to North Carolina’s land warrants, or other claims of North Carolina, as the same could or would be subject to as regards the United States, if the same were not so, as aforesaid released.”
By reference to the boundaries of the State of Tennessee, as fixed by the Constitution of 1796, it is clear that the island in controversy, was not within her limits. After describing a dividing line between North Carolina and Tennessee, it is declared “that all the-territory, lands and waters lying West of said line, *295 and contained within the chartered limits of ■ North Carolina, are within the boundaries and limits of the State of Tennessee.” The middle of the main channel of the Mississippi river being the Western boundary, and the island then b'eing West of the main channel, it follows that it was not within the limits of North Carolina, and therefore, not within the limits of Tennessee.
But by the Constitution of Tennessee, of 1834, a material addition was made to the definition of the boundaries of the State. After describing the boundaries as in the Constitution of 1796, this proviso was added: “that the limits and jurisdictions of this State shall extend to any other land and territory now acquired, or that may hereafter be acquired by compact or agreement with other States, or otherwise, although such land and territory are not included -in the boundaries hereinbefore designated.”
Under the provisions of this Constitution (and they are the same as that of 1870), the State of Tennessee had jurisdiction over any lands not included within her original boundaries, which she had then acquired, or might thereafter acquire by compact or otherwise. If then, the State of Tennessee, in 1834, had jurisdiction over the island in controversy, or if she has since acquired such jurisdiction, it is wholly immaterial that the island may originally have been situated West, of the Western boundary.
It is in proof, that as early as 1826, the State of Tennessee, through her various officers, judicial and ministerial, claimed and exercised jurisdiction over *296 the island, bnt as against the United States in which the title was vested, this claim and exercise of jurisdiction did not and could not vest the title in the State, but this continued exercise of jurisdiction may be legitimately looked to in determining the question whether there is still in the United States a present, valid, dona fide, subsisting title.
In determining this question, the first act of the United States which deserves attention is the recognition in 1836, by the admission of Arkansas into the Union, of the middle of the Mississippi river as it then was, as the Eastern boundary of that State. Before that time the Territory of Arkansas and the State of Tennessee had the middle of the main channel of the river as it was in 1803, as a common boundary line. The United States had the legal right to the lands on both sides of the line, and therefore had a right to agree to the change in the line, resulting from the change in the main channel of the river. This fact furnishes persuasive evidence that in recognizing the Eastern boundary of Arkansas as running through the main channel of the river, through the cut-off, the United States also recognized that line as the Western boundary of Tennessee. This inference is strengthened by the fact that in the act of 1841, constituting Tennessee an agent to dispose of the lands South and West of the Congressional reservation line, all the vacant, unappropriated and refuse lands within the State, were designated without making any exception as to the island added to the territory of Tennessee by the avulsion of 1822.
*297 But the final action of Congress in releasing and surrendering the title to the lands South and West of the Congressional reservation . is still more conclusive. The act for this purpose was passed in 1836, and in response to a memorial of the General Assembly of Tennessee, adopted in 1845. In that memorial the language was: “Your memorialists would earnestly, but respectfully urge upon Congress, both the propriety and justice of ceding to the State of Tennessee all the vacant and unappropriated lands South and West of the Congressional reservation line, for the purposes of education,” etc. In pursuance of this memorial, the Congress enacted that “the United States hereby release and surrender to the State of Tennessee the right and title of the United States to all lands in the State of Tennessee, lying South and West of the Congressional reservation line in said State, which may yet remain unappropriated,” etc. That the United States intended by this act to surrender to Tennessee her entire title to all vacant and unappropriated lands within her boundaries as they were then recognized, is made certain by the fact that from that time to the present, no claim has been set up by the United States to any public land in the State.
In view of all these facts and circumstances, it cannot be said that the United States has a present, subsisting, legal and bona fide title to the land in controversy, and that the title formerly vested in the United States has not been abandoned and surrendered to the • State of Tennessee. On the contrary, the *298 conclusion is irresistible that by the act of 1846, the United States surrendered and released to the State of Tennessee, all right and title to the land in controversy, and by virtue of the Constitution of 1834, the State has, since. that time, possessed and exercised exclusive control and jurisdiction thereof, and that the same was subject to appropriation by entry and grant in pursuance of the laws of the State. As the State of North Carolina never had any claim to or jurisdiction over this land it was never subject, while the property of the United States, to any incumbrances or conditions in respect to military warrants or other North Carolina claims, nor can it be subject to any such incumbrances or conditions since its surrender and release to the State of Tennessee.
For the errors, in the charge of the Circuit Judge indicated, the judgment will be reversed, and a new trial awarded, when the law will be charged as laid down in this opinion.