## CESSILL vs. THE STATE.

STATE BOUNDARY: "*Main channel*" *of the Mississippi River:*

The eastern boundary of this State is the midway line between the principal banks of the Mississippi river. Where there are two channels, with an intervening island, the middle of the larger is the boundary. The word "channel" as descriptive of the boundary, has no reference to the track of navigation.

Cessill v. The State.

APPEAL from *Mississippi* Circuit Court.

HON. L. L. MACK, Circuit Judge.

*O. P. Lyles* for appellant.

Cites: *Constitution* 1874, 1836; *Cooley, Const. Lim.,* p. 31; 5 *Wheat,* p. 696; 10 *Wall.,* 91; 13 *How.,* 381; *Smith's S. C.,* 2nd Vol. 225; *Missouri v. Iowa,* 7 *Howard;* 10 *Pet.,* 662; *Missouri v. Kentucky,* 11 *Wall.,* 395; *Bole v. Ill. Cent. R. Co.,* 1 *Black's R.* 204.

*C. B. Moore,* Attorney General, for the State.

Cites: *Const. of* 1836 *and* 1874; *Mo. v. Ky.,* 11 *Wall.,* 395; *Bates v. Ill. Cent. R. Co.,* 1 *Black,* 204; *Myers v. Perry,* 1 *La. Am.,* 372; *State v. Muller,* 35 *Iowa,* 199; *Rover on Interest at Law,* ch. 34, *especially pp.* 337-342.

EAKIN, J. Appellant was convicted of selling liquors without license. The sales were made on a boat permanently anchored on the Mississippi river, off the Arkansas shore, opposite Mississippi county. The theory of the defense was that the spot was not in the State, inasmuch as the present "main channel" of the river which here forms the eastern boundary of the State, does not now run as it did on the 30th of October, 1874, when the boundaries of the State were last defined; but that *then* the principal channel ran to the west of the present location of the boat, leaving it outside of the State. Throughout "channel" is treated as meaning best navigable track of boats.

There was evidence tending to show that the position of the boat was eastward of the channel for boats in 1874. It is confessedly westward of the present channel, and about midway between the *principal banks* of the river, which are not shown to have changed; and much nearer a bar on the Arkansas side than it is to the water edge in Tennessee. There is *some* evidence, also, from which a jury might infer

Cessill v. The State.

that the boat was nearest the principal bank on the Arkansas side; although the evidence is chiefly directed to the location of the navigable low water channel, at different periods.

The Court, in effect; instructed the jury that if the liquor was sold at a point opposite Mississippi county, between the main land and the then main channel of the river, they should consider it as sold in Mississippi county; and refused to instruct that they should find for defendant if they might find the spot to be eastward of what was the main channel on 30th of October 1874, the date of the adoption of the Constitution. A similar instruction was also refused with reference to the date of the Constitution of 1836, under which the State was admitted into the Union. For these reasons, and also because the verdict, as alleged, was not sustained by the evidence, there was a motion for a new trial. This was refused, and defendant appealed.

It will be observed that the principle upon which the Court proceded is, that the line of deepest water in the river bed is the boundary of the State, and continues such as it fluctuates.

The Act of Congress admitting the State into the Union, approved June 16, 1836, designated for the eastern boundary, "the middle of the main channel" of the Mississippi river, between latitude 36° north, and the northeast corner of the State of Louisana, at a point to be determined by extending the north line of the latter State to the middle of the said channel. This description was embodied in the Constitution of 1836, and repeated in that of 1864. It was also adopted in the Constitution of 1868, with the explanation that the said boundary should include a certain island known as Belle Point Island. In addition to this, the present Constitution provides, generally, that the State shall embrace "all other land originally surveyed and included as a part of the territory of the State of Arkansas."

No question arises in this case upon either of the two quali-
fications, and the sole matter left for us to decide is this:
What is meant by the "main channel," and what is the
the middle of it?

The channel of a river, bay or sound is, in boatman's par-
lance, the course over its bed along which the water is
deepest, and the navigation safest. This may be irrespective
of the current, or distance from the shore. In questions of
geography or boundaries, however, it is more generally
used to designate the depression of a bed below permanent
banks, forming a conduit along which waters flow, and
which may be at some times full, and at others nearly if not
quite dry. In this sense it is of common use in law. It is
the more obvious signification in connection with bounda-
ries, inasmuch as it presents something of a permanent
nature, or at least at all times visible; and when changed
leaving traces of the old landmarks. In this sense we
speak of bayous—Bartholomew and Atchafalaya—as old
*channels* of the Arkansas and Red rivers. They have
permanent features independent of water; whereas channels,
in the sense of the river pilot, are ever shifting, invisible—
discoverable only by patient soundings, and then imperfectly.
We cannot suppose that such channels would be adopted as
State boundaries, or as references to determine them.

The Mississippi river is full of islands—having water beds
on each side. The object of the description of the boundary
was to afford the means of determining whether or not any
given island was within the State, by taking the largest of
these water conduits as the true river. The middle of the
main channel, then, must mean the point or line along
the river bed equi-distant from the permanent and defined
banks of the ascertained channel on either side. Even
this line is a fluctuating one, but in a far less and no very
inconvenient degree. *Gradual* attrition on one side, with

Cessill v̄. The State.

accretion on the other, making a change in the permanent banks, might perhaps change the boundary with regard to absolute space. But it is not necessary, for practical purposes, that a boundary should be a fixed mathematical line, and this could only apply to changes in the banks of a channel which remains substantially the same. For if the main body of the water were to find a new channel, and abandon the old one, leaving intervening lands in a natural state, the old boundary would be still ascertainable, and would govern. This has been decided in the case between Kentucky and Missouri, (*infra*) and results, with regard to surveyed lands, from the additional clause above noted, in the Constitution of 1874. It seems that the largest channel determines which is the river, and the central line of that makes the State boundary.

The boundary line in question is a very old one, and does not concern this State alone. It originated with the treaty between England, France and Spain, in February, 1763, which made the middle of the Mississippi river the boundary between the British and French territories. This line has been ever since observed in subsequent treaties, in federal legislation, in State Constitutions and judicial decisions, and there are not lacking unmistakable indications of the meaning of the middle of the river. For instance, in the treaty between the United States and Spain, in October, 1795, before our purchase of Louisiana, the fourth article provides "that the Western boundary of the United States, which separates them from the Spanish colony of Louisiana, is in the middle of the channel *or bed* of the river Mississippi, from the northern boundary of said States to the completion of 31st degree of latitude north of the equator."

In the case of *Myers v. Perry et al*, 1 *La. Ann.*, which resulted from a steamboat collision on the Mississippi, it became necessary to acsertain the *locus in quo* as affecting

jurisdiction between the States of Louisiana and Mississippi. The middle of the river was taken as the boundary line, without any reference to depth of water. See also, on the same subject, a case very replete with historical learning, that of *Morgan and Harrison v. Reading, reported in 3d Sm. and Mar.*, 366, in which this great empire boundary is described with reference to the treaty of 1763, as *"a line drawn along the middle of the Mississippi."* This would not be a good description of a steamboat track, zigzagging from bank to bank amongst sand bars in low water.

In the case of *Missouri v. Kentucky*, 11 *Wall.*, 395, which was a contest between States for the jurisdiction over Wolf Island, in the Mississippi. Mr. Justice Davis said that by virtue of the treaties above named, together with the treaty of peace with England, in 1783, the ancient right of Virginia, to which Kentucky had succeeded, extended to the *middle of the bed* of the Mississippi river.

It seems that where there are several channels, the principal one is considered the river, and in this the *medium filum* makes the boundary.

There was only one channel in this case, which was the river bed between the Arkansas and Tennessee shores at Osceola. The Court and attorneys treated the case throughout as if channel meant the line of deepest water sought by boatmen, and the instructions were given on one side and refused on the other with reference to this idea. The river bed being the same as in 1874, no question could arise as to change of *channel*. The instructions asked by the defence were erroneous, but those given for the State were equally so, being based on a false theory as to the meaning of channel. It should have been left to the jury to determine whether the position of the boat was nearer to the Arkansas

or the Tennessee main bank, and to have found the defendant guilty or innocent accordingly.

Reverse and remand for a new trial.