## CASES

### ARGUED AND DETERMINED

# SUPREME COURT OF ILLINOIS.

(No. 11043.—Judgment affirmed.)

MABEL HARTZELL RANDOLPH, Appellee, *vs.* JOHN HINCK, Appellant.

*Opinion filed February 21, 1917.*

1. WATERS—*limit of rule that the boundary line between States changes with variation in the thread of stream.* The rule that the boundary line between States separated by a river changes with the variation of the middle of the channel or thread of the stream applies where the river, by imperceptible accretion and reliction, gradually changes its bed, but the rule does not necessarily apply to a case of sudden avulsion.

2. SAME—*when island remains in original State though channel of river has changed.* Where the main channel of a river forming the boundary between two States changes its channel from one side of an island to the other, if the island still remains in such condition that it can be identified as the original island it will remain within the jurisdiction of the State of which it was originally a part. (*Bellefontaine Improvement Co.* v. *Niedringhaus,* 181 Ill. 426, distinguished.)

3. SAME—*when owner of island does not lose title by submersion of soil.* The owner of land on an island in a river does not lose her title or right to possession by the mere fact that the land is submerged, provided the soil is subsequently reclaimed either by natural or artificial means, and the lapse of time during which the land was submerged does not bar the owner's rights.

APPEAL from the Circuit Court of Randolph county; the Hon. GEORGE A. CROW, Judge, presiding.

J. FRED GILSTER, and EDWARD ROBB, for appellant.

H. CLAY HORNER, for appellee.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Randolph county in favor of Mabel Hartzell Randolph, appellee, in an action of ejectment against John Hinck, appellant, and involves the question of the title and the right of possession to an island in the Mississippi river now known as Hinck island.

Appellant first questions the jurisdiction of the court, and contends that the land in question is not within the State of Illinois but is wholly within the State of Missouri. The land now comprising what is known as Hinck island was originally a part of an island which for many years has been known as Crain's island. At the time Illinois was admitted into the Union the main channel of the Mississippi river flowed south and west of Crain's island and that island was surveyed as part of the State of Illinois. The land now known as Hinck island at that time consisted of the northwestern end or head of Crain's island. Since the admission of the State of Illinois into the Union there have been many changes in the channel of the Mississippi river in the vicinity of Crain's island. For a time the channel continued to be entirely west of that island, and the middle thread of that portion of the stream constituted the boundary line between the States of Illinois and Missouri when they were each admitted into the Union. The channel shifted from time to time, finally cutting off a part of the head of Crain's island, and for a number of years the main channel passed over a part of the upper portion of Crain's island, cutting off that portion now known as Hinck island.

The river finally washed out a channel between the two islands and the Illinois shore and for a number of years thereafter followed both the channels between Hinck island and the Illinois shore and between Hinck island and Crain's island. The channel between the two islands finally filled up to such an extent that it was closed to traffic, and the channel between Hinck island and the Illinois shore became the sole channel for steamboat traffic and has since continued to be the main channel of the river. It is upon this situation and this state of facts that appellant contends Hinck island and Crain's island are now wholly within the State of Missouri and that the boundary between the State of Illinois and the State of Missouri is the middle of the channel flowing between those islands and the Illinois shore. In support of this contention appellant relies upon the cases which hold that the boundary between States separated by a river is the thread of the stream, and that this boundary changes with the variation of the center of the river's main channel. This rule applies where by imperceptible accretion and reliction the river gradually changes its bed. Under such conditions, where the river constitutes the boundary between two States, the boundary is changeable and follows the middle thread of the main channel. As long as this change is gradual and imperceptible and due only to accretion and reliction, whereby the soil of one State is so gradually taken away as to be imperceptible and soil is in the same gradual and imperceptible manner added to the shore of the other State, the boundary line between the two States will follow the middle thread of the channel. To make this rule applicable it is essential that the soil of one proprietor be washed away gradually and imperceptibly and that soil be added to the land of the opposite proprietor in the same gradual and imperceptible manner. Where a tract of land retains its original substance and does not lose its identity or change its situation it does not pass from the dominion of one State to another by the action of the river

constituting the boundary in changing its channel. Thus, in case of sudden avulsion, where a tract of land by the violence of the stream and in consequence of the water cutting a new channel is separated from the tract of which it was originally a part, if the part so cut off be in such condition that it can still be identified, the property of the soil so removed or the tract so cut off by the change remains vested in its former owner and remains within the jurisdiction of the State of which it was originally a part. So, also, in case of an island where the main channel of the stream is transposed from one side to the other and the island remains intact and in such condition that it can still be identified as the original island, the land so removed to the opposite side of the main channel of the stream remains vested in its former owner and remains under the dominion of the State of which it was originally a part.

In *Missouri* v. *Kentucky,* 11 Wall. 395, the State of Missouri filed a bill in the United States Supreme Court to obtain possession, jurisdiction and sovereignty over Wolf island, in the Mississippi river, as part of the territory of Missouri. In passing upon the question involved the court called attention to the fact that the treaty between the French, Spanish and English in 1763 stipulated that the middle of the Mississippi river should be the boundary between the British and French territories on the North American continent; that the boundary of Missouri when it was admitted into the Union, in 1820, was fixed on this basis, and that Kentucky in 1792 succeeded to the ancient right and possession of Virginia, which extended, by virtue of these treaties, to the middle of the bed of the Mississippi river. The court held that it followed that if Wolf island in 1763 or in 1820, or at any intermediate period between those dates, was east of that line the jurisdiction of Kentucky rightfully attached to it, and if the river has subsequently turned its course and now runs east of the island the status of the two States is not altered by that fact, for

the channel which the river abandoned remains, as before, the boundary between the States, and the island does not, in consequence of that action of the water, change its owner.

The case of *Griffin* v. *Johnson,* 161 Ill. 377, was an action of ejectment for the recovery of the possession of a tract of land between land owned by Johnson on Crain's island and the Missouri shore, being the same Crain's island involved in this case. While the question of jurisdiction here suggested was not raised nor passed upon in that case, we recognized the doctrine as laid down in *Missouri* v. *Kentucky, supra,* by recognizing Crain's island as being within the State of Illinois, although at that time the main or deep-water channel of the river was between the island and the Illinois shore.

The holding in *Missouri* v. *Kentucky, supra,* is not contrary to the holding in *Bellefontaine Improvement Co.* v. *Niedringhaus,* 181 Ill. 426, upon which the appellant relies. What was there said refers to the boundary between States where the main or deep-water channel has been gradually shifted by imperceptible accretion and reliction. With the exception of such changes as have been caused by the action of the river, as hereinafter noted, Crain's island has remained in the same situation and condition as it was at the time it was surveyed as part of the State of Illinois. The island has not been carried away by gradual and imperceptible reliction nor has it been formed by gradual accretion. It has remained there all the time. The mere fact that the bed of the river from natural causes has been changed from one side of Crain's island to the other does not transfer that island from the State of Illinois to the State of Missouri. The boundary line between the two States is the center of the old channel of the river west of Crain's island as it existed before the channel shifted to the easterly side of the island. The court had jurisdiction of the subject matter and of the parties.

The head or northwesterly end of Crain's island as it originally existed was in section 32, township 7, south, range 6, west of the third principal meridian, in Randolph county. That part of section 32 composing the head of the island was divided into lots 2, 3, 5 and 6, the last three lots being the land involved here. It is stipulated in the record that appellee has a complete chain of title of record to lots 3, 5 and 6 from the government of the United States and that there are no objections to the deeds in that chain of title, and the questions raised do not affect appellee's title as shown by those deeds but are questions of boundary, riparian rights and other questions collateral to such chain of title. The contention of appellant is, briefly, that while appellee holds the record title to lots which once existed as part of section 32, those lots were completely submerged and washed away by the river; that new and different lands formed in this same location, to which newly formed lands appellee has no title or right of possession, but that the same are owned either by appellant or by the shore owner on Crain's island under his rights as riparian owner.

To sustain his contention appellant introduced various maps in evidence and produced witnesses who testified to the various changes which had occurred in the river at the head of Crain's island. At the present time Hinck island occupies, so far as the matters here involved are concerned, almost the exact location in section 32 that was occupied by said lots 2, 3, 5 and 6 when the subdivision of section 32 was made. In addition it extends down some distance into section 5, which adjoins section 32 on the south, and the foot of the island takes in a small portion of sections 4 and 33, said sections 4 and 5 being in the township immediately south of that in which section 32 is situated. By the United States land surveys introduced in evidence it appears that the northerly part of Hinck island as it now exists practically coincides with the head or northerly part of Crain's island as it existed in 1815. In 1867 the shore line

of the head of Crain's island had receded in some places and had extended a little further into the river at other places. In 1880 it had receded quite perceptibly, but a small bar or island was left north of the main island. In 1888 the main shore line of Crain's island had receded almost down to the south line of sections 32 and 33, leaving a bar or island of considerable size some distance north of the main shore line and within the original boundary of the head of the island. Between this bar and the shore line of the head of Crain's island was a channel which for a time became the main channel of the river. In this channel the steamboat Belle of Memphis sank in 1896. In 1915 the shore line of Crain's island, as shown by the surveys, had receded southward until it was a considerable distance south of the south line of sections 32 and 33, and the land which is now known as Hinck island extended southward until it included a portion of the lands in said sections 4 and 5, leaving between Crain's island and Hinck island a shallow channel which at some stages of the river is practically dry. In addition to these plats appellant introduced evidence tending to show that Hinck island began to form in 1898 and 1899, and that the island formed around the wreck of the Belle of Memphis, which sank about the center of the island as it now exists, and that there was no land between the Illinois shore and what was then Crain's island at the time the Belle of Memphis sank. Appellant purchased the wreck of the Belle of Memphis and went upon it in September, 1901, and has since made his home there. At that time, he testifies, there was but little ground around it.

It is clear from the record that at some time between 1867 and 1899 the whole of that part of Crain's island which was subdivided as lots 3, 5 and 6 of section 32 was submerged, but whether it was all submerged at one time or how long any particular portion of it was submerged does not clearly appear. It is apparent that if it was all

submerged at one time the water over the major portion of it was quite shallow, and as a whole it never became the bed of the deep channel of the river. From the government surveys it appears that in 1880 there was a small bar off the head of Crain's island as it then existed, which was within the survey of the lands claimed by the appellee. In 1888 this bar, or that part of the island above the water, had assumed much larger proportions. It does not appear from the testimony of anyone that steamboats were ever able to navigate over any portion of this land except the narrow channel that lay between the head of Crain's island as the shore line existed in 1888, and part of what is now known as Hinck island as its southern shore existed in 1888. It was in this channel that the Belle of Memphis sank. That the lands subdivided as said lots 3, 5 and 6 were never wholly washed away is apparent. There is some testimony to the effect that they were totally submerged at one time, but appellee did not lose her title or the right of possession to these lands by the mere fact that they were submerged, even though the period of submersion was for a considerable length of time. The riparian owner does not lose his property in the soil by submersion or avulsion if the soil is afterward reclaimed either by natural or artificial means, nor does the lapse of time during which the soil is submerged bar the owner's rights. *City of Chicago* v. *Ward,* 169 Ill. 392.

In *Morris* v. *Brooke,* (an unreported case arising in Delaware in 1815) the controversy arose over the ownership of an island called Wilson's bar, which had been created by alluvion upon land formerly contained within the boundary of an island called Little Tinnicum, which at some time had been worn away by the ocean. The opinion of Judge Wilson is thus quoted in *Mulry* v. *Norton,* 100 N. Y. 424: "The right to the new island and also to land gained by alluvion or dereliction, all of which are governed by the same principle, follows the right to the soil which is cov-

ered by the water. Though the surface of the lower part
of Little Tinnicum was destroyed by the force of the winds
and the waves and it was consequently overflowed by the
water of the river, yet the owner did not lose the propriety
of the remaining land covered by the water if it was re-
gained either by natural or artificial means. It continued to
belong to the original proprietor."

· Both *City of Chicago* v. *Ward, supra,* and *Mulry* v.
*Norton, supra,* quote with approval Hargrave's Law Tracts,
(Sir Matthew Hale's De Jure Maris,) 36, 37, as follows:
"If a subject hath land adjoining the sea and the violence
of the sea swallow it up, but so that yet there be reasonable
marks to continue the notice of it, or, though the marks
be defaced, yet if by situation and extent of quantity and
bounding upon the firm land the same can be known, though
the sea leave this land again or it be by art or industry re-
gained, the subject does not lose his property; and accord-
ingly it was held by Cooke and Foster, M., (7 Jac. C. B.)
though the inundation continue forty years.  *  *  *  But
if it be freely left again by the reflux and recess of the sea
the owner may have his land as before if he can make it
out where and what it was, for he cannot lose his propriety
of the soil though it be for a time become part of the sea
and within the admiral jurisdiction while it so continues."
Thus, in effect, each of these cases holds that no lapse of
time during which the submergence has continued bars the
right of the owner to enter upon the land reclaimed and
assert his proprietorship when the identity of the land can
be established by reasonable marks or by situation, extent
of quantity and boundary on the firm land. *Mulry* v. *Nor-
ton, supra,* further holds that if an island forms upon land
submerged it belongs to the original owner, and that the
sovereign succeeds to the ownership of such islands and
formations, only, as are originally created and located in
tideways outside of boundaries of property which has been
the subject of individual ownership.

The land described and conveyed in the chain of title to appellee is identical with the land now existing on the island known as Hinck island. It can be identified and located by situation, extent of quantity and boundary from the original survey. Appellee was entitled to the lots in question.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*