MOORE & McFERRIN v. McGUIRE et al.

(Circuit Court, E. D. Arkansas, W. D. January 10, 1906.)

1. STATES—BOUNDARY—WESTERN BOUNDARY OF MISSISSIPPI.

Act March 1, 1817 (3 Stat. 348, c. 23, § 2), admitting the state of Mississippi into the Union, which described the boundary as "beginning on the river Mississippi; * * * thence west * * * to the Mississippi river; thence up the same to the beginning," must be construed as fixing the western boundary at the boundary of the territory ceded to the United States by the state of Georgia in 1802 for the purpose of creating a new state, which was the middle of the main channel of the Mississippi river; that having been fixed by the treaty of 1763 between England, France, and Spain as the boundary between the English and French territory, and the land now constituting the state of Mississippi being at that time a part of the colony of Georgia.

2. SAME.

Evidence considered, and held to establish that in 1817, when the state of Mississippi was admitted, and also in 1836, when Arkansas was admitted, Island No. 76 in the Mississippi river was east of the main channel, and therefore became a part of the state of Mississippi, and furthermore was not within the boundaries of the state of Arkansas as fixed by the act of admission.

3. SAME—LOSS OF SOVEREIGNTY BY PRESCRIPTION AND ACQUIESCENCE.

A state may lose its sovereignty and jurisdiction over its territory by prescription and acquiescence, where such facts are clearly established.

4. TAXATION—REFUNDING TAXES PAID—CLAIMS—SPECIAL TRIBUNAL—POWERS.

Ann. Code Miss. 1892, § 3831, provided that, "if land be sold for taxes, when no taxes are due on it, or it is not liable to be sold for taxes," the

sum paid therefor by the purchaser should be refunded to him from the state and county treasuries, and created a board consisting of the Governor, Attorney General, and Auditor of Public Accounts to audit and allow claims thereunder. *Held*, that the provision could not be construed as conferring on such board the power to determine that lands sold for taxes were not within the state, and that its action in refunding the amount paid therefor to the purchaser on that ground was not conclusive on the state.

5. STATES—ISLAND IN MISSISSIPPI—CONFLICTING CLAIMS OF SOVEREIGNTY.

Island No. 76, lying in the Mississippi river between the Mississippi and Arkansas shores, was in fact on the east side of the main channel in 1817, when the state of Mississippi was admitted, and became a part of that state and was surveyed by it about 1830. In 1846 it was also surveyed by Arkansas, and on such survey the greater part of it was sold and patented by the United States in 1848. In 1852 it was selected by Mississippi under the swamp land grant, and the selection was approved, but no patents issued thereon. The matter was pending before the Land Department at the beginning of the Civil War and was then dropped. The land was taxed in Arkansas from 1848 and sold for taxes. It was also taxed and sold for taxes by Mississippi in 1882 and subsequently. It did not appear that there had ever been any permanent residents on the island. *Held*, that there had not been acquiescence by Mississippi in the claims of the Arkansas authorities for such length of time as to deprive it of its sovereignty over the island, and that a federal court in Arkansas was without jurisdiction of a suit to determine the title to lands thereon.

In Equity.

The complainants seek by this bill to quiet their title to a tract of land constituting an island in the Mississippi river, now known as "Island No. 76." The material allegations in the original bill and amendment thereto are that the complainants, citizens of the state of Illinois, are the owners and in possession of the lands in controversy, which are situated in the county of Desha and state of Arkansas. They derain their title to all of the lands except 51 acres as follows: Certificates of purchase and patents from the United States government, issued in July, 1847, and at various times thereafter during the same year, showing purchases and entries at the United States Land Office in Helena, Ark.; the lands being described as being in fractional sections 35 and 36, township 11 S. of the base line, range 1 E. of the fifth principal meridian, and fractional sections 1 and 2, in township 15 S. of the base line, range 1 E. of the fifth principal meridian. That afterwards said lands, having been duly assessed by the proper officers of the state of Arkansas for taxes, were forfeited to the state for the nonpayment thereof. While thus held by the state, it instituted an action in equity on the chancery side of the circuit court of Desha county, state of Arkansas, under the provisions of the statutes of that state then in force, to determine whether the forfeiture of those lands to the state of Arkansas was valid, and, if not, to ascertain the taxes due thereon to the state and county, declare them a lien upon said lands, and, if not paid by a time to be designated by the court, that they be sold for the taxes thus found by the court to be due and declared a lien thereon. That on October 11, 1883, a decree was rendered by said court setting aside the forfeitures to the state, finding the amount of taxes due on the lands, and declaring them to be a lien, and, if not paid within the time designated by the decree, that they be sold by the special commissioner appointed by the court for that purpose. The moneys decreed to be due and declared to be a lien on the lands not having been paid, they were sold in conformity with the orders of the court, by the special commissioner appointed for that purpose, and purchased by Sallie H. Murphy, to whom, after confirmation of the sale by the court and the expiration of the time within which the owners had, under the law, the right to redeem, a proper deed of conveyance was executed; and complainants now claim title by conveyance from the said Sallie H. Murphy, made on August 22, 1898, and ever since which time they allege they have been in possession thereof.

As to the remaining 51 acres of the island not included in the sales made by the United States, when the other lands were sold in 1847, complainants derain their title as follows: A patent from the United States to the state of Arkansas under the swamp land grant of 1850, which patent was executed in 1858, the lands having been selected by the state of Arkansas as swamp and overflowed lands; subsequent conveyances by the state of Arkansas to John Evans, under whom complainants claim title by mesne conveyances fully set out in the bill. It is then charged that the island is in the Mississippi river, lying in front of portions of Bolivar county, state of Mississippi, and Desha county, state of Arkansas; that, ever since the sales made by the government and the conveyance by the state of Arkansas, the lands were assessed and subjected to state and county taxes in Desha county, Ark. It is further charged that by act of Congress of 1817, admitting the state of Mississippi into the Union, the western boundary of that state was fixed on the eastern bank of the Mississippi river, which has never been changed by any act of Congress, and that the said east bank of the Mississippi river is still the western boundary of that state; that in 1836 (Laws 1836, p. 9) the Legislature of that state, in establishing the county of Bolivar, fixed the boundary line on the west as "to the Mississippi river; thence up the Mississippi river." It is also charged that at the time of the admission of the state of Arkansas into the Union in 1836, and at the date of the survey of the public lands in said state by the Surveyor General of the United States for said state, the main channel of the Mississippi river was east of this island, and therefore the island became a part of the territory of said state, although since then the main channel of the river has changed, first to one side and then to the other. That, notwithstanding these facts, the complainants learned in 1899 that the state of Mississippi claimed ownership of these lands by reason of forfeitures for nonpayment of the state and county taxes assessed and levied by the authorities of Bolivar county, Miss., and that under such claim the state sold them to the defendants, citizens of Mississippi, who now claim title thereto. That neither the state of Mississippi nor the county of Bolivar made any claim that said island was in that state until in 1882, after changes had been made in the main channel of the Mississippi river. That in 1892 the state of Mississippi sold the island, which it claimed to own by reason of a forfeiture for the nonpayment of taxes, to Curry & Hall, but that in 1893 or 1894, upon the application of said Curry & Hall to the Auditor of State, a board authorized by the laws of the state of Mississippi to determine those questions decided that those lands were situated in the state of Arkansas and not subject to taxation in the state of Mississippi, and for this reason caused the money paid by Curry & Hall to the state for the purchase of those lands to be refunded to them out of the state treasury, which was done. That notwithstanding these facts, defendants, during the temporary absence of complainants from the island, attempted to take possession of these lands by threats of intimidation. The bill then proceeds to narrate various acts of the parties interfering with complainants' rightful possession, and prays for process, for an injunction against the defendants, and to quiet their titles. The defendants pleaded to the jurisdiction of the court, upon the ground that the lands are not situated in the state of Arkansas, but in the state of Mississippi. They also deny most of the material allegations in the bill, but, as upon the argument it appeared that the only question necessary for a proper determination of the controversy is in what state the lands are lying, it is unnecessary, in this statement of facts, to refer to any parts of the answer other than those material to the plea of the jurisdiction of the court.

The plea or answer denies that the legal effect of the act of Congress admitting the state of Mississippi into the Union fixes the eastern bank of the Mississippi river as the western boundary of the state, but charges that by that act the middle of the main channel of the Mississippi river was fixed as such boundary, and that the state of Mississippi has been in possession of all the island ever since, exercising jurisdiction over the same. They deny that at the time the surveys for Arkansas were made the main channel of the river was east of the island, but charge that at that time, and long prior thereto, and at the time of the admission of Mississippi into the Union, the main chan-

nel of the river was west of the island. They also deny that any officials of that state, authorized by law to act for the state, ever abandoned the state's claim of jurisdiction, or conceded it to the state of Arkansas, and, if they did so, they acted without authority and in violation of the Constitution of the state of Mississippi, and their acts therefore were void and not binding upon the state.

E. D. Meyers and Rose, Hemingway & Rose, for complainants.

A. Y. Scott, John M. Moore, and W. B. Smith, for defendants.

TRIEBER, District Judge (after stating the facts). 1. Where is the western boundary line of the state of Mississippi, under the act of Congress admitting the state into the Union?

The language of the act of Congress admitting that state into the Union, approved March 1, 1817, describes the western boundary of the state as follows:

"Beginning on the river Mississippi at the point where the southern boundary line of the state of Tennessee strikes the same; thence east; * * * thence south; * * * thence west along the said degree of latitude to the Mississippi river; thence up the same to the beginning." 3 Stat. 348, c. 23, § 2.

On the part of the complainants it is insisted that this act fixes the boundary line at the Mississippi river, and not in the middle of the main channel of the river. In grants of land the well settled rule is that:

"All the grantor's title will pass by the conveyance which describes the line along the river as running 'with' or 'along' the stream, or as running 'by' or 'on' or 'upon' the stream, or 'up' or 'down' the stream." 3 Farnham on Waters and Water Rights, § 853, and numerous authorities cited there; Gould on Waters, § 195.

In St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941, the description was:

"To the present bank of the Mississippi river; thence along the extended line * * *° to low water mark of the Mississippi river; and thence down to the extended line between surveys 156 and 157."

The contention was that the deed did not convey to the grantees the fee of the bend of the river beyond low water mark (in Illinois the riparian owners owning the bed of the river); but the court held that all the right, title, and interest of the grantor, including the bed of the river to the middle of the main channel, passed by the conveyance. See, also, on that point Vattel on the Law of Nations, par. 120; Handly v. Anthony, 5 Wheat. 374, 5 L. Ed. 113; Indiana v. Kentucky, 136 U. S. 479, 10 Sup. Ct. 1051, 34 L. Ed. 329.

But from an examination of the treaties, cessions and acts of Congress on that subject, there can be little doubt what the intentions of Congress were. The treaty between France, Spain, and England, concluded in February, 1763, stipulated that the middle of the Mississippi river should be the boundary between the British, and the French territories on the continent of North America. This line has never been changed. It was recognized by the treaty of peace with Great Britain in 1783, and by different treaties since then, the last of which resulted in the acquisition of the territory of Louisiana (embracing the country west of the Mississippi river) by the United

States in 1803.   The boundaries of the state of Missouri, when she was admitted into the Union as a state in 1820, were fixed on this basis, as were those of Arkansas in 1836.   Missouri v. Kentucky, 11 Wall. 395, 401, 20 L. Ed. 116.   At the time of the treaty between France, Spain, and England in 1763, the colony of Georgia owned all of that territory, and consequently, by virtue of that treaty, to the middle of the main channel of the Mississippi river; the part west of the middle of the river belonging to France.   By the act of cession of the state of Georgia, April 24, 1802, that state ceded to the United States:

"All the right, title and interest which the said state has to the jurisdiction and soil of the land situated within the boundaries of the United States south of the state of Tennessee and west of a line beginning on the western bank of the Chattahoochee river where the same crosses the boundary line between the United States and Spain."

The act of cession of Georgia then further provides:

"Fifthly. That the territory thus ceded shall form a state and be admitted as such into the Union as soon as it shall contain sixty thousand free inhabitants, or at an earlier period, if Congress shall think it expedient, on the same conditions and restrictions, with the same privileges," etc.

Subsection 2 provides:

"The United States accept the cession above mentioned and on the conditions therein expressed," etc.   Clayton, Comp. Laws, p. 48, No. 35.

When in 1817 the state of Mississippi was admitted into the Union, Congress, in pursuance of the obligations assumed by the articles of cession and agreement of the state of Georgia before mentioned, could do nothing less than to cede to the state formed from this territory all the territory ceded by Georgia for that purpose.   When the territory of Arkansas was formed, its boundaries were:

"All that part of the Missouri territory which lies south of a line beginning on the Mississippi river," etc.   Act March 2, 1817, 3 Stat. 493, c. 49, § 1.

The territory of Missouri at that time constituted the northern part of the territory of Louisiana, acquired by the treaty of 1803 with France, and included all that part of the Mississippi river west of the middle of the main channel, as defined by the treaty between France, Spain, and England in 1763.   When in 1836 the state of Arkansas was admitted into the Union, its eastern boundary was fixed in the middle of the river.

If complainants' contention is to be sustained, the court must not only hold that Congress violated the trust it assumed by the articles of cession and agreement made with the state of Georgia in relation to this territory, but that it left the east half of the Mississippi river along the entire state of Mississippi without being incorporated in any state.   This would hardly be a reasonable construction of the acts of Congress.   In the opinion of the court, the western boundary line of the state of Mississippi is the middle of the main channel of the Mississippi river.

2. Where was the main channel of the river at the time of the admission of Mississippi into the Union?

The well settled rule is that the boundaries of a state must be determined by what they were at the time of its admission, unaffected by the action of the forces of nature upon the course of the river. Missouri v. Kentucky, 11 Wall. 395, 401, 20 L. Ed. 116; Indiana v. Kentucky, 136 U. S. 479, 508, 10 Sup. Ct. 1051, 34 L. Ed. 329. The middle of the main channel of the Mississippi river being the boundary line between the states of Mississippi and Arkansas, the important question to be determined is where it was in 1817, when Mississippi was admitted into the Union and its boundaries determined, not only by the act of admission, but also by the act of cession of the state of Georgia, which, as shown hereinbefore, the national government accepted in trust for the purpose of creating a new state. Th . "main channel," as defined by the Supreme Court of the United States, is the "main navigable channel, and not the thread of the stream or the middle of the bed of the stream.". Iowa v. Illinois, 147 U. S. 1, 13 Sup. Ct. 239, 37 L. Ed. 55.

In so far as it is sought to establish the fact where the main channel of the river was at that time by oral evidence, it is very unsatisfactory, except that the evidence conclusively establishes the fact that ever since 1839, and probably two or three years before that time, up to the year 1881, the main channel was east of the island in controversy, and since 1881 up to the present time west of the island. As to what it was prior to 1839, the testimony of some old river pilots is that as early as 1839 they had been advised that it had always been east of the island. On the other hand, in a letter written by Major Downing, at one time United States Surveyor of Public Lands in the state of Mississippi, to the Governor of Mississippi, in relation to that matter, he states that in 1835 he traveled a great deal on the river at that point, and that at that time the channel was where it is now, west of the island. This testimony is so unsatisfactory and conflicting that it is hard to determine from it alone where the channel really was. Captain Miller, the pilot, who was seventy-nine years old at the time his deposition was taken, might easily have been mistaken as to what his father really told him. He testified that his father had navigated the river as a bargeman since 1812, and when in 1839, he being then a boy 17 years old, he made his first trip as a pilot with his father and brother, he was told that the channel had always been east of the island. It is easily conceivable that, his father having told him that this was the channel, and being aware of the fact that his father had navigated the river ever since 1812, he concluded that his father meant that the channel had been east of the island ever since he had navigated the river. Major Downing's letter, written in 1859, is at best but slight evidence, as he was not an experienced river man, and the letter was but an ex parte statement made in an effort to secure the lands of the island for the state of Mississippi under the swamp land grant of 1850.

Mr. Justice Davis, who delivered the opinion of the court in Missouri v. Kentucky, supra, in speaking of the testimony of men who navigated the river in the early days engaged in the business of flatboating, which, he says, "is hardly ever undertaken in a low stage of water," says:

"There is nothing to show that any of them ever made a personal examination of the channels and surrounding objects at this point, and there is a remarkable absence of facts to sustain their opinions. It is also noticeable, in connection with this evidence, that none of the witnesses (Hunter may be an exception) ever lived in the vicinity of the island, or remained there any length of time, and that all the knowledge any of them acquired of the state of the river was obtained by passing up or down it at different times, either on flatboats or steamboats. Notwithstanding they swear positively that the channel was always east of the island, yet Watson says it changed for about three years, and Ranney testifies that on one occasion, when the main channel was divided into three parts, the deepest water for a short time in the fall of the year was found on the west of the island, and steamboats passed on that side.  *  *  *  And passing the river only occasionally, and without any knowledge of where the volume of water flowed when the river was low, they would naturally conclude it was the main channel." 11 Wall. 403, 404, 20 L. Ed. 116.

This remark applies with great force to the testimony in this case. Be this as it may, we are not confined to this testimony, as the maps and surveys and other acts of officials, made in those early days, enable the court to determine where the channel was prior to the admission of the state of Arkansas into the Union in 1836, and very near the time of the admission of Mississippi as a state in 1817. The main channel of a river having been once established by proper proof, the presumption, in the absence of evidence to the contrary, will be that it was there before that time and remained there since. Thus, it being established conclusively, as found by the court, that the main channel of the river was east of this island in 1839, the presumption, in the absence of proof to the contrary, is that it was there before that time, even as early as 1802, when the state of Georgia ceded the territory to the government for the purpose of creating the state of Mississippi.

The first survey and map of the river in the vicinity of this island, so far as the evidence in this case shows, was made in 1821, under direction of the War Department of the United States. The indorsements on this map are:

"Reconnaissance of the Mississippi and Ohio rivers 1821. This reconnaissance of the Mississippi and Ohio rivers was made during the months of October, November and December, 1821, by Captain H. Young and Captain W. T. Poussin, of the topographical engineers, and Lieutenant S. Tuttle, of the engineers, under the direction of the board of engineers. Soundings on the bars were made during the months of October and November and it is believed that they are accurate for the lowest stage of waters in common years. In very dry seasons, the lowest stage of waters would be about 10 inches lower."

The map also shows a "table of conventional signs used throughout this reconnaissance of the Mississippi and Ohio rivers," to explain the marks and different colors on the map. The copy introduced in evidence is certified by the Secretary of War to be "true copies of the originals on file in the office of the Chief Engineer U. S. Army." This map pretends to show the different islands, whether with growth of heavy timber or with willows, and subject to annual inundations. It also indicates dry sand bars, lines of shallow water, and the lines of the channel of the river. The scale of lengths is one inch to a mile, and for breadths two inches to a mile. On this map the island in controversy is called "Chapeau Island." The coloring on this island indicates that it has a growth of heavy timber on it; that to the east

of it is a sand bar covering about one-third of the space between the island and the Mississippi main shore; and that for some further distance to the east (the Mississippi shore) there is shallow water, leaving but a narrow body of water between the main shore and the shallow water; and it also indicates that the channel of the river is to the west of the island.

The map next in date to that is the sectionalized survey, certified on January 22, 1829, by W. M. McRee, who signs it as surveyor of public lands in Illinois, Missouri, and Arkansas, which gives the survey of fractional townships 11 and 12, range 1 east of the fifth principal meridian, in the state of Arkansas, conformable to the field notes of the surveys thereof on file in this office. This plat shows a survey of the lands on the main shore of the state of Arkansas opposite this island, but no survey of the island itself. It further shows a survey of the width of the river by triangulation. The surveys of the river made above and below the island in controversy extended to the main shore of the state of Mississippi, but where the island is the survey was made only to the west bank of the island. There is a sketch of the island on the map, but no indication that it was surveyed, or that it pretended to be anything near an accurate outline of the island. The surveys and field notes from which this map was made are certified on the map to have been made in February, 1827, by Daniel Miller.

The plat next in date introduced in evidence is that of a survey of township 21, range 8 W., Choctaw district, state of Mississippi, made by Benjamin Griffin, a deputy surveyor, in January and February, 1830, and approved by Jos. Dunbar, surveyor of public lands south of Tennessee. This plat bears the following indorsement:

"Surveying the boundary lines, all section lines, connections to the front sections, traverse of both sides of Bolivar Lake, traverse of the Mississippi, charged by B. Griffin, Volume 3, 1832. Also traverse and retraverse of Island 76."

This plat also shows only a survey of the lands on the main shore, but not of the island, although the indorsement "also traverse and retraverse of Island 76" would indicate some kind of a survey of that island. A sketch of the island appears on this map, but nothing to indicate a survey, or that it is more than a mere eye sketch.

The plat next in date introduced in evidence is another map of township 21, range 8 W., Choctaw district, and the field notes of the surveyors from which the map was made. This map shows the same survey of township 21, range 8 W., as the map last mentioned, and in addition thereto a complete survey of Island 76 and sectionalizing of the lands thereon, which are described on this map as fractional sections 36 and 37 of township 21, range 8 W., Choctaw district, and containing the following indorsements:

"The whole of this township was surveyed by Benjamin Griffin, deputy surveyor, in January and February, 1830. Surveyor's office, Washington, Mississippi, May 31, 1830. Examined and approved. Jos. Dunbar, Surveyor South of Tennessee."

The copy of this map introduced in evidence is certified to by the state land commissioner of the state of Mississippi, who certifies:

"That he has in his official keeping the records of the Surveyor General's office, and that the map is a true and faithful tracing and copy of and from the original now on file and in his official keeping."

In the deposition of Mr. Nall, the commissioner of state lands for the state of Mississippi, he explains that all the records of the Surveyor General's office for the state of Mississippi were turned over to the state of Mississippi and are kept in his office. A copy of this map was filed with the department in Washington, October, 1836, as shown by a letter from Hon. Thomas A. Hendricks, Commissioner of the General Land Office in 1859. The certified copies of the original field notes of township 21, range 8 W., filed on April 9, 1830, do not show that the island was included in the survey of that township, but a certified copy of additional field notes filed in the Surveyor General's office for Mississippi on October 30, 1830, show a complete survey of Island 76, beginning at the upper end, made by Benjamin Griffin, the same deputy surveyor who surveyed that township on the main shore. On these field notes, which are stated in black ink to be those of township 22, range 8 W., Choctaw district, the following indorsements are in red ink:

"Island 76 is in township 21, range 8 W., and not in township 22, range 8 W., and that, instead of sections 6 and 7, they should be sections 36 and 37, township 21, range 8 W."

In another place, where the notes in black ink, are "Beginning at the upper end of section 6 (Island 76)," the words "36 in Island 76" are written in red ink above. In another place on these field notes there is written in red ink: "Section 6 should be section 36, township 21, range 8 W."; and where the survey of section 7 begins there is an interlineation in red ink, "Section 7 should be section 37, township 21, range 8 W." Another indorsement on these field notes is:

"Distance across the shoot of Island 76, from the beginning of the last station north, 40 east, 2020 intersecting the opposite traverse, 26 chains on the first station"

—indicating that the beginning of the survey of Island 76 at the upper end of it was, by actual measurement from the last station surveyed in township 22, range 8 W., on the main shore of the Mississippi river, 26 chains. By the depositions it is also proven that, when Benjamin Griffin made the survey of this island and prepared his field notes, he intended to survey it as a part of township 22, but when he made the plats he found that the island was too far south to be in township 22 but should properly be in township 21, and for this reason made them as sections 36 and 37; all other sections being included in the original survey of township 21.

In 1846, when the undisputed evidence shows the channel had for several years been east of this island, another survey of the island was made by the Surveyor General of the public lands in Arkansas, and sectionalized as fractional sections 35 and 36, township 11 S., range 1 E., of the fifth principal meridian, and fractional sections 1 and 2

of township 12 S., range 1 E., of the fifth principal meridian. This plat contains the following indorsements:

"Surveyor's Office, Little Rock, Arkansas, 23rd December, 1846.

"The above plat of fractional sections 35 and 36 in township 11 S. of the base line, range 1 E. of the fifth principal meridian, and of fractional sections 1 and 2, township 12 S. of the base line, range 1 E. of the fifth principal meridian, is strictly conformable to the field notes of the survey thereof on file in this office, which have been examined and approved. The sub-divisional lines meanderings of townships 11 and 12 S., range 1 E., and south boundary of fractional sections 35 and 36, township 11 S., range 1 E., amounting to 7 miles 39.11 chains, were surveyed in February, 1846, by John W. Garretson, D. S., under contract of 24 September, 1845, and were paid for by the Treasurer of the United States upon the account rendered and accepted by John W. Garretson, D. S., and certified from this office as Voucher No. 1, Fourth Quarter, 1846.

"[Signed] William Pelham, Surveyor of Public Lands in Arkansas."

The copy introduced in evidence is certified by the Department of the Interior to be a true copy of the township plat of the survey to which it purports to relate now on file in that office.

It will be noticed that the surveys made by the surveyor of public lands in the state of Mississippi describe the lands according to the Choctaw meridian established for public lands east of the Mississippi river, while the surveyor in the state of Arkansas describes them as south of the base line and east of the fifth principal meridian, the lines established by the national government for surveys of public lands west of the Mississippi river. No doubt this contributed somewhat to the confusion of the officers of the Land Department, as will be shown hereafter.

In 1847, after the filing of the Pelham survey, these lands were placed by the national government on the lists of public lands subject to sale with the register of the United States land office at Helena, Ark., under the description of the Pelham survey; but there is nothing to indicate that they were ever placed on sale in any of the United States land offices for the sale of the public lands in the state of Mississippi. In 1847 all of these lands except 51 acres were sold by the national government to various parties and patents issued to them, describing the lands as lying in townships 11 and 12 S., range 1 E. of the fifth principal meridian, "in the district of lands subject to sale in Arkansas," but not describing the county or state in which they were situated. The 51 acres not sold by the government were, in 1859, patented to the state of Arkansas under the Swamp Land Act of September 28, 1850, c. 84, 9 Stat. 519. The lands on the island were selected by the state of Mississippi under the swamp land grant act of 1850 on June 12, 1852, and approved as such on September 24, 1854. In 1854, before any patents to the lands had been issued by the national government, the state of Mississippi sold these lands to W. G. Ford, but as the lands had been sold by the government, through the Arkansas land office, in 1847, no patent therefor was ever issued to the state of Mississippi; the act of 1850 granting to the states only the unsold lands.

The field notes of the Mississippi survey made in 1830, and the testimony of witnesses also, establish the fact that the island was

highest on the west side; that some timber had been cut on the same part of the island, and a small clearing was on that part of the island. This is of some importance, as it is well known that the lands bordering on the Mississippi river are always highest next to the main channel, and slope downward away from the river. This is owing to the fact that the annual overflow of the river leaves most of the sediment on the bank nearest the main channel; as the timber cut in those days was used almost exclusively to supply steamboats with fuel, it was naturally cut near the channel which the steamboats used in navigating the river, and clearings were made nearest to the boat landings in order to enable the parties easy access to the boats, which at that time were the only means of conveyance for freight and passengers. Taking these facts into consideration, and the facts that the map made in 1821 under direction of the War Department, the survey by Miller of the public lands in Arkansas· in 1827, and the plat made from this survey by McRee in 1829, and the plat from the survey made in 1830 by Griffin, deputy surveyor of public lands in the state of Mississippi, and approved by Dunbar, Surveyor General for that state, treat the island as lying in the state of Mississippi, and the further fact that, as shown by that latter map, the bed of the river between the island and the main shore of the state of Mississippi was at that time in some places so narrow as to make it impossible for the immense volume of water running in the Mississippi river at that place to pass, the finding of the court is that in 1836, as well as in 1817 and long before that time, Island 76 was east of the middle of the main channel of the Mississippi river, and for this reason a part of the state of Mississippi, and not within the boundaries of the state of Arkansas, as defined by the act of admission of that state.

3. Has there been such an assumption of sovereignty by the state of Arkansas, and acquiescence by the state of Mississippi, as to change the sovereignty over the island from the state of Mississippi to the state of Arkansas?

In determining this question, we must not overlook the well-established distinctions between ownership of lands and the exercise of sovereignty by sovereign states; at the same time, although the states of this Union are sovereign, and possess all the powers of sovereign states except those powers which, by the Constitution, are granted to the general government, the rules of international law governing independent nations cannot be applied to the full extent in relation to these subjects of prescription and acquiescence. There is no written law to settle disputes of that kind between independent nations, nor is there any tribunal whose jurisdiction can be invoked by one of the parties without the consent of the other, and whose judgment will be conclusive on both parties. Nor must the fact be overlooked that, while the boundaries of the different states of the Union are well defined, especially of those admitted since the adoption of the national Constitution by acts of Congress admitting them, a great deal of the territory claimed by other nations depends solely upon discovery or the right of possession. Disputes of that nature between independent nations can only be settled by

treaty or conventions to submit to arbitration or resort to the sword, while, on the other hand, our Constitution provides for a tribunal to settle these matters, whose jurisdiction can be invoked by either of the parties to the dispute, regardless of the wishes of the other party, and whose judgment is conclusive on all parties.

It has never been authoritatively determined by the courts of the United States whether a state can lose its territory by prescription and acquiescence. In 26 Am. & Eng. Enc. Law (2d Ed.) 469, the author says:

"The period of time which in equity constitutes a bar is held not to apply to the case of a disputed boundary between two states, especially where the boundary is in a wild and unsettled country; but it seems that long possession under a claim of title will be protected, especially where there is not clear proof of mistake."

In Belding v. Hebard, 103 Fed. 532, 43 C. C. A. 296, the head-note is:

"It having been found as a fact from sufficient evidence furnished by the confirmatory acts of the two states [referring to the states of North Carolina and Tennessee], based on a report of the joint commission, and by the natural objects therein designated, that the state boundary was actually run and established along Hangover ridge, that boundary could not be changed by the action of the state authorities in recognition of the other line claimed, unless such recognition has been so long and continuous on the part of both states as to create a mutual estoppel, and constitute an adoption of such line as the true and established boundary. It is not sufficient to create such estoppel or constitute such adoption that the surveyor general of Tennessee, in 1836, stopped the survey of lands adjacent to the boundary ceded by the Indians at the marked line of trees on Slick Rock creek, and that for that reason, and because of such marked trees, such line was generally reputed to be the boundary until 1882; it appearing that no grants of any of the lands in the disputed territory were made by North Carolina prior to 1853, and no settlers entered it until 1860, and very few thereafter, all of whom were squatters without title, who have claimed citizenship in one or the other state, as best served the interests of their landlords; and that since 1882 grants have also been made by Tennessee, and opinion as to the true boundary has been divided."

In Rhode Island v. Massachusetts, 4 How. 591, 11 L. Ed. 1116, the question of boundary between two states was involved, but in that case the court found that the original charters were somewhat ambiguous; that over 200 years had elapsed since the charter of Massachusetts was issued, and over 180 years since the Rhode Island charter; that in 1702 commissioners were appointed by the colonies of Massachusetts and Connecticut to settle the boundaries between them, which was accordingly done; that in 1710 Massachusetts and Rhode Island appointed commissioners to determine this line, and it was determined by them at that date; that in 1718 commissioners appointed by those states in 1716 and 1717 again determined the boundary line, which was accepted by the general assemblies of both states; and that since that time Massachusetts has always claimed and exercised jurisdiction over the land up to the line designated. While some protests were made by Rhode Island from time to time, nothing definite was done by her to offset the decisions of these commissioners. Upon these facts the court held that no mistake was clearly established, but even if it had been established, that the court would not disturb these settlements.

In Missouri v. Kentucky, 11 Wall. 395, 20 L. Ed. 116, the same question came before the court. In that case the court found the facts to be that Kentucky, ever since it was a state, and up to the time of the institution of the suit by Missouri, exercised jurisdiction over the island in controversy; that it was embraced within her surveys made in 1837; that the people residing thereon paid their taxes to Kentucky and voted in that state, and at one time one of its residents was elected as a member of the general assembly of the state of Kentucky. On the other hand, Missouri never attempted to subject the inhabitants of the island to her laws or to exercise any jurisdiction therein. The court also found, from certain physical facts connected with the island, somewhat similar to those established in this case, that it must have been at one time a part of the main shore of Kentucky and at some remote period separated by the formation of the east channel. Upon these facts the court held that the island was a part of the state of Kentucky. The exercise of jurisdiction by Kentucky was not held by the court as being conclusive, but was a strong circumstance when considered in connection with the other facts established by the proof.

In Indiana v. Kentucky, 136 U. S. 479, 10 Sup. Ct. 1051, 34 L. Ed. 329, the state of Indiana waited for over 70 years after her admission as a state before she instituted the action, and during all of that period the court found:

"It was over 70 years after Indiana became a state before this suit was commenced, and during all this period she never asserted any claim by legal proceedings to the tract in question. She states in her bill that all the time since her admission Kentucky has claimed the Green River Island to be within her limits and has asserted and exercised jurisdiction over it, and thus excluded Indiana therefrom, in defiance of her authority and contrary to her rights. Why then did she delay to assert by proper proceedings her claim to the premises? On the day she became a state her right to Green River Island, if she ever had any, was as perfect and complete as it ever could be. On that day, according to the allegations of her bill of complaint, Kentucky was claiming and exercising, and has done so ever since, the rights of sovereignty both as to soil and jurisdiction over the land. On that day, and for many years afterwards, as justly and forcibly observed by counsel, there were perhaps scores of living witnesses whose testimony could have settled, to the exclusion of a reasonable doubt, the pivotal fact upon which the rights of the two states now hinge and yet she waited for over 70 years before asserting any claim whatever to the island, and during all those years she never exercised or attempted to exercise a single right of sovereignty or ownership over its soil. It is not shown, as he adds, that an officer of hers executed any process, civil or criminal, within it, or that a citizen residing upon it was a voter at her polls, or a juror in her courts, or that a deed to any of its lands is to be found on her records, or that any taxes were collected from residents upon it for her revenues."

The court thereupon held:

"This long acquiescence in the exercise by Kentucky of dominion and jurisdiction over the island is more potential than the recollections of all the witnesses produced on either side. Such acquiescence in the assertion of authority by the state of Kentucky, such omission to take any steps to assert her present claim by the state of Indiana, can only be regarded as a recognition of the right of Kentucky too plain to be overcome, except by the clearest and most unquestioned proof. It is a principle of public law universally recognized, that long acquiescence in the possession of territory and in the exer-

cise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority."

At the end of the opinion, on page 518, 136 U. S., page 1057, 10 Sup. Ct. (34 L. Ed. 329), the court said:

"We have not deemed it important to take up the testimony of each of the numerous witnesses produced in the case by the states of Indiana and Kentucky. It would serve no useful purpose to attempt an analysis of the testimony of each, and to show how little and how much weight should be attributed to it. All the testimony is to be taken with many allowances from imperfect recollection, from the confusion by many witnesses of what they saw with what they heard, or of what they knew of their own knowledge with what they learned from the narrative of others. The clear and admitted facts we have mentioned, corroborated as they are by nearly everything of record presented, leave on our minds a much more satisfactory conclusion than anything derived from the oral testimony before us. The long acquiescence of Indiana in the claim of Kentucky, the rights of property of private parties which have grown up under grants from that state, the general understanding of the people of both states in the neighborhood, forbid at this day, after a lapse of nearly a hundred years since the admission of Kentucky into the Union, any disturbance of that state in her possession of the island and jurisdiction over it."

In Virginia v. Tennessee, 148 U. S. 503, 13 Sup. Ct. 728, 37 L. Ed. 537, the boundary line between those states had been fixed in 1802 by commissioners appointed by the two states and approved by them. Ninety years later Virginia instituted her suit to establish the boundaries according to the original charters granted by the English sovereign, which it was alleged entitled her to a part of the territory claimed by Tennessee. The court in that case, speaking on the subject of acquiescence, say:

"Independently of any effect due to the compact as such, a boundary line between states or provinces, as between private persons, which has been run out, located, and marked upon the earth, and afterwards recognized and acquiesced in by the parties for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the course given in the original grant; and the line so established takes effect, not as an alienation of territory, but as a definition of the true and ancient boundary." 148 U. S. 522, 13 Sup. Ct. 736, 37 L. Ed. 537.

Further on in the opinion, in speaking of the fact that in two districts of small dimensions the residents have always voted as citizens of Virginia and have recognized themselves as citizens of that state, the court say:

"That fact, however, cannot affect the potency and conclusiveness of the compact between the states by which the line was established in 1803. The small number of citizens whose expectations will be disappointed by being included in Tennessee are secured in all their rights of property by provisions of the compact passed especially for the protection of their claims." 148 U. S. 527, 13 Sup. Ct. 737, 37 L. Ed. 537.

From these authorities, the conclusion reached by the court is that a state may lose its sovereignty and jurisdiction over its territory by prescription and acquiescence whenever these facts are clearly established. The authorities do not agree as to the length of time for which such acquiescence must continue before there will be a loss of jurisdiction. Some eminent writers on international law have suggested a period of 50 years, but I am of the opinion that the safest rule to

accept would be that of the common law, that in order to acquire title by prescription the exercise of ownership must have been for such length of time that "the memory of man runneth not to the contrary."

Do the facts in this case show such acquiescence on the part of the state of Mississippi, and are the acts of the state of Arkansas relative to this island such, and have they been for such length of time, as will estop the state of Mississippi from now claiming its own?

In De Bussche v. Alt, 8 Ch. Div. 286, 47 L. J. Ch. 381, 38 L. T. 370, Lord Justice Thesiger defines acquiescence as follows:

"If a person having a right and seeing another person about to commit, or in the course of committing, an act infringing upon that right, stands by in such manner as really to induce the person committing the act, and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act. This, as Lord Cottonham, in Leeds v. Amherst, 2 Ph. 117, 16 L. J. Ch. Div. 5, 10 Jur. 956, said, is the proper sense of the term acquiescence, and in that sense it may be defined as acquiescence under such circumstances as that assent will be reasonably inferred from it, and is no more than an instance of the law of estoppel by words or conduct."

In Scott v. Jackson, 89 Cal. 262, 26 Pac. 899, the court defined acquiescence to be:

"Where a person who knows that he is entitled to impeach a transaction or enforce a right neglects to do so for such a length of time that, under the circumstances of the case, the other party may fairly infer that he has waived or abandoned his right."

From the proofs adduced the following facts appear: That until shortly before the institution by defendants of the suits in the courts of the state of Mississippi for unlawful detainer, and the commencement of this action, the island was not inhabited except when timber was cut and a small clearing was made; that whenever possession was had it was desultory, and there is not any evidence to justify a finding that there was a permanent possession by any one claiming title, or that those who went on the island were citizens of Arkansas or Mississippi; that immediately after the issuance of the patents by the United States the proper authorities of the state of Arkansas placed the lands on the taxbooks and assessed them as lands lying in that state, and continued to do so ever since, although the taxbooks prior to 1865 for the county of Desha, in which said lands were assessed, were destroyed during the war, and there is no positive evidence to show such assessments prior to 1865. In view of the fact that the laws of the state of Arkansas require all lands, when sold by the national government, to be placed on the taxbooks and assessed for taxation, the presumption is that the officers obeyed and executed the law. On the other hand, it appears that immediately after the passage of the swamp land grant act of 1850, when the state of Mississippi selected the swamp and overflowed lands subject to the grant, which was done in 1852, they included these lands among those selected by her. That in 1854 the selections thus made, including the lands on the island, were approved by the Secretary of the Interior, although no patent was issued to the state of Mississippi to any of the lands until 1858. Shortly after the approval of the selections

142 F.—51

made by the state of Mississippi, the authorities of that state, acting no doubt under the belief that the grant made by Congress was in præsenti, and that the approval, therefore, by the Secretary of the Interior vested a perfect title in the state to all the lands selected, and without waiting for the patent, sold these lands to one Ford. On February 28, 1855, it having been, no doubt, ascertained by Ford that the lands purchased by him had theretofore been sold by the government under the Pelham survey as lands situated in Arkansas, Hon. John Wilson, then commissioner of the general land office, to whom, no doubt, Hon. Jacob Thompson, then one of the representatives in Congress from the state of Mississippi, had mentioned the subject, in a letter written by him to Mr. Thompson, in which he refers to a conversation had with him the day before, states:

"That it appears on reference to the plats in this office Island No. 76 was surveyed by the surveyor general of Mississippi as a part of township 21 N. of range 8 W. of the Choctaw meridian and base line, returned with his certificate of approval, bearing date the ——— day of October, 1836, and that the island No. 76 was surveyed under direction of W. Pelham, Surveyor General of Arkansas, in February, 1846, as parts of townships 11 and 12 S. of range 1 E. of the fifth principal meridian in that state, and certificate to this office the 23d December, 1846. The island does not appear to have been offered at public sale in either state. I am of the opinion, from the inspection of the plats, that the island in question belongs to the jurisdiction of Mississippi and should not have been surveyed and returned as lying in the state of Arkansas. Still, I must qualify this opinion by stating that, if it should be found by measurements and evidence taken on the subject that the middle of the main channel of the river as it existed in 1817, the date of the admission of the state of Mississippi, prescribing her boundaries was situated east of the island and remained unchanged until the year 1836, the date of the act of admission of Arkansas as a state, then the island undoubtedly belongs to the latter, but if in 1817 the middle of the main channel was east of the island, and in 1836, by changes in the bed of the river, was west of the island, then it will occupy the peculiar position of not being within the limits of either state according to the boundaries prescribed by the acts of admission."

On May 3, 1859, the Governor of the state of Mississippi wrote to Hon. Jacob Thompson, then the Secretary of the Interior, in relation to that matter, stating:

"Island 76 was confirmed to the state by the federal government and afterwards sold to William G. Ford. I am informed that this island is now claimed by the state of Arkansas. The inclosed letters from Major Downing and William Ford, with the certificate of the Secretary of State, contain all the information in my possession on the subject. You are hereby requested to adjudicate the case and to confirm or sustain the title of Ford through the grant to this state."

The letters referred to are one from W. G. Ford to the Governor, making his claim to these lands, and also inclosing a letter from A. Downing, at one time the Surveyor General of Public Lands for the state of Mississippi, in which Major Downing says:

"Island 76 was surveyed, I think, in 1830 or 1831, as part of township 21, range 8 W. At that time, and for some years after, the island shoot, as it was called, was quite narrow. I think that about opposite the middle of the island the shoot was not over a hundred yards wide. I have been told that deer had been, and could easily be, shot from the eastern shore of the river upon the island, and from my own observation, I have no doubt but they could, for at that time I had never heard of a steamboat going up or down

on the east side of the island. The main river then passed on the west side of the island. I think it was 1835 I spent some time in township 21, range 8 W., examining the land in that district. The east bank of the river opposite the island had not fallen in much. The island shoot at that time was quite narrow."

These communications were, by the Secretary of the Interior, referred to the Commissioner of the General Land Office, at that time Hon. Thomas A. Hendricks, of Indiana. Mr. Hendricks, on July 23, 1859, wrote the following letter to the Governor of Mississippi:

"As it appears on reference to the plats in this office, this island was surveyed by the Surveyor General of Mississippi as a part of township 21 N., range 8 W., Choctaw meridan, Miss., and returned with the certificate of approval under date of October, 1836. It also appears that, under the direction of the Surveyor General of Arkansas, this island was surveyed in February, 1846, as a part of townships 11 and 12 S., range 1 E., Helena District, Ark., and returned with certificate of approval dated December 23, 1846. A proclamation for the sale of lands in the Helena district, including this island, was made, and the tracts on said island were duly offered for sale on the 12th of July, 1847. Subsequently the greater portion of the tracts were entered and patents were issued to the purchasers prior to the 28th of September, 1850, the date of the swamp grant. The island as situated within the limits of the state of Mississippi has never been proclaimed for sale. The question of state jurisdiction over this island was presented to my predecessor, and he, in a communication of the 28th of February, 1855, says: [quoting here the letter of Mr. Wilson hereinbefore referred to]."

He then proceeds:

"With your letter I find the statement of A. Downing, dated 18 January, 1859, going to show that said Island 76 belongs to the Mississippi side and falls within our limits as defined by the treaty of 1763. Mr. Downing was formerly Surveyor General of Mississippi, and great reliance is to be placed upon his statement. If, therefore, you will add to it his affidavit, with the testimony of any other disinterested witness, so as to bring the matter within the qualification of my predecessor's opinion, and stating that the island is of a swampy character—such is the additional testimony contemplated by Secretary McClellan's decision, as required by the second section of the act of 2d March, 1855, notwithstanding the island has been reported as swamp—the testimony will then be fully of equal grade to that required in cases analogous, and thereupon an account will be opened between the state and the United States, with a view to her reinbursement by treasury warrant of the amount of cash," etc.

Shortly thereafter, in the early part of 1861, the states of Mississippi and Arkansas attempted to secede from the Union, and, the Civil War having broken out, nothing further seems to have been done until after the close of the war in 1865, when the proper officers of Desha county, state of Arkansas, again assessed the lands as being in that state. The evidence fails to show what became of Ford or the purchasers from the national government who bought them as Arkansas lands, and the probabilities are that they all died during the war. No one paid the taxes assessed against the lands by the Arkansas authorities, and the lands were forfeited to the state of Arkansas for the nonpayment thereof, and they remained in that condition until 1882, when the state of Arkansas, under an act of its Legislature enacted in 1881, known as the "Overdue Tax Law" (Laws 1881, p. 63), instituted proceedings in equity in the circuit court of Desha county for the purpose of having the lands sold for the taxes

due thereon. As hereinbefore stated, there was a decree condemning the lands to be sold, and the grantors of complainants became the purchasers thereof.

It may be proper to state here, in connection with this matter, that, when the Legislature of the state of Mississippi, in 1836, created the county of Bolivar, as well as several other counties bordering on the Mississippi river, in defining the western boundaries, the language used in the act of Congress admitting the state into the Union, "To the Mississippi river; thence up the Mississippi river," was followed by the Legislature, but in 1838 the Legislature, in defining the boundaries between Bolivar and other counties, used the language, "Thence down the main channel of the said Mississippi river." In adopting the Revised Code of Mississippi, known as Hutchinson's Code, approved February 2, 1857, a concise history of the limits and boundaries of the state was included in the Code, and the boundaries of the state of Mississippi, in so far as it affects this case, are described as follows:

"Thence west along the said degree of latitude to the middle or thread of the stream of the Mississippi river; thence up the middle of the Mississippi river or thread of the stream to the place of beginning, including all islands lying east of the thread of the stream of said river." Article 1, § 2, c. 2, p. 49, Hutchinson's Code.

Article 2 of the same section, found on page 50 of that Code, provides:

"The counties lying immediately on the Mississippi river shall respectively have and possess jurisdiction and extend to the middle of the river or western boundary of the state within the space embraced by extending their boundary lines which strike the river on a continuous, direct course to the extreme boundary of the state, including all islands that may be within the limits thus defined."

The Constitution of the state of Mississippi adopted in 1868 merely provides that:

"The limits and boundaries of the state of Mississippi shall remain as now established by law." Article 2.

The Constitution of the state adopted in 1890 defines the boundaries, so far as it is applicable to the issues involved in this cause, as follows:

"Thence west along said degree of latitude to the middle or thread of the stream of the Mississippi river; thence up the middle of the Mississippi river or thread of the stream to the place of beginning, including all islands lying east of the thread or stream of said river, and also including all lands which were at any time heretofore a part of this state." Article 2, § 3.

Section 4 of article 2 provides:

"The Legislature shall have power to consent to the acquisition of additional territory of this state and make the same a part thereof, and the Legislature may settle disputed boundaries between this state and its coterminous states whenever such disputes arise."

The first act on the part of any of the officials of the state of Mississippi, after the Civil War, which in any way indicates a claim of this island as a part of the territory of that state was a resolution of the board of supervisors of Bolivar county, reciting that, whereas, many tracts of land in that county subject to taxation are not assessed upon the taxbooks of the county, mentioning among others the

lands on Island 76 described by the Mississippi survey, the assessor was directed to assess them for taxation, which was accordingly done and the assessment made to "unknown owners." The taxes not being paid on these lands, they were in 1882 forfeited to the state of Mississippi, and, not having been redeemed within the time prescribed by the laws of that state, were placed on the book of state lands of that state as lands forfeited to the state for the nonpayment of taxes. In 1891 these lands were sold by the state of Mississippi to Hull & Curry, and immediately thereafter assessed to them for taxation by the proper authorites of Bolivar county. In 1892 Hull & Curry filed a petition with the commissioner of state lands of that state, reciting that, since purchasing them, they had ascertained that the lands were not subject to taxation in the state of Mississippi, as they were lying in the state of Arkansas, and asked for a refunding of the purchase money paid by them. The act under which this proceeding was had is section 3831 of the Annotated Code of Mississippi, adopted by the Legislature in 1892. That act is as follows:

"If land be sold for taxes when no taxes are due on it, or it is not liable to be sold for taxes, the sum paid by the purchaser for the amount of his bid, and the costs of the sale and conveyance, with six per centum interest per annum, shall be refunded to him, or the holder under him, by descent or purchase mediately or immediately, by the state or county respectively, in proportion to the amount received by each; and in such case the claim against the state shall be audited and allowed by the auditor of public accounts on due proof, with the approval of the Governor and the Attorney General, and he shall draw his warrant on the treasurer for the amount shown to be due; and the claim against the county in such case shall be allowed by the board of supervisors of the county, and paid out of the county treasury, on the certificate of the auditor of public accounts of the refunding of the state tax. If in such cases, the money paid by the purchaser be not paid into the state and county treasuries, the collector shall be liable on his official bond to the purchaser for the amount so paid, and twenty-five per centum interest per annum on such sum, and the state and county shall not be liable. The provisions of this section shall extend to taxes collected for levee purposes where land is improperly sold, and the amount due in such case shall be paid to the proper person by the levee treasurer on the order of the levee board."

The board sustained the claim of Hull & Curry and directed the refund to them of the purchase money out of the treasury of the state, which was done. Hull & Curry thereafter failed to pay the taxes assessed against the land; whereupon it was again forfeited to the state of Mississippi. The Auditor of Public Accounts of that state (who is ex-officio the State Land Commissioner), being in doubt as to whether these lands should, in view of the former action of the board, be placed on the land books of the state, called upon the Attorney General of the state for his opinion, and that official, in an opinion dated April 20, 1894, advised him to adhere to the former ruling of the board and treat the lands as lying in the state of Arkansas. For some reasons not explained, the Land Commissioner declined to follow the opinion of the Attorney General, but placed the lands on the books as lands belonging to the state. Thereafter, 1899, the defendants in this case purchased them from the state of Mississippi, receiving proper deeds of conveyance therefor, and now claim title under these deeds.

There is no attack in the case at bar upon the titles to these lands acquired by virtue of the patents issued by the United States to the purchasers of the lands as Arkansas lands; but it is insisted that, although the title passed from the United States to these purchasers, the lands being in the state of Mississippi were subject to taxation there and to sale for nonpayment of the taxes, and that not lying in the state of Arkansas this court is without jurisdiction to determine the title thereto.

The island being uninhabited, there can be no doubt but that the acts of the officials of the state of Arkansas in assessing these lands for taxation was the only act of sovereignty that could have been, under the circumstances, exercised over them by the state of Arkansas. Therefore, the conclusion naturally follows that the state of Arkansas did, ever since 1848, make claim to the island as being a part of her territory; but, on the other hand, can it be said that the state of Mississippi, after learning of the claim of the state of Arkansas, acquiesced in those acts of sovereignty on the part of the state of Arkansas? As early as 1838, and ever since that time, the Legislature of that state claimed the western boundary to be in the middle of the river. In 1852 they selected them as swamp and overflowed lands, under the swamp land grant made by Congress in 1850. In 1854, shortly after the approval of her selections by the Secretary of the Interior, the lands were sold by her to Ford. While it is true that there is nothing to show that these lands thereafter were placed on the taxbooks and assessed for taxation by the authorities of Bolivar county, that may be accounted for by reason of the fact that no patent having ever been issued by the government to the state of Mississippi, or to anyone else, they probably did not consider them as subject to taxation. In 1855 some claim to these lands must have been made by Hon. Jacob Thompson, one of the representatives in Congress from that state; otherwise the letter of Hon. John Wilson, then the Commissioner of the General Land Office of the United States, would not have been written. In 1858 the Governor of the state again made claim to these lands by addressing the Secretary of the Interior on the subject. The breaking out of the Civil War, and the confusion incident thereto after its conclusion will explain the delay between that time and the order of the board of supervisors of Bolivar county made in 1881 to place these lands on the taxbooks. At all events, that delay was not for so long a time as to estop the state from claiming its own by reason of acquiescence.

What was the effect of the action of the board composed of the Governor, Attorney General, and Commissioner of State Lands in refunding the money to Hull & Curry and determining that these lands were not in the state of Mississippi, but in the state of Arkansas? Are the acts of this board conclusive on the state of Mississippi? That the Legislature could have invested that board, or any other commission, with such powers is, no doubt, true. It may also be assumed that, if that board had jurisdiction and power to determine that question, its acts would be conclusive on the state, but does the act vest such power in that board? A careful examination of the

act will not warrant this contention. What was intended by the act, as I consider it, was to enable any person who had purchased lands from the state and whose title failed, by reason of the fact that there were no taxes due on them, or that they were not liable to be sold for taxes, to have the money refunded to him. It is true the language used, "not liable to be sold for taxes,". is broad enough to include lands not within the state and for this reason not subject to taxation; but it is hardly reasonable to suppose that the Legislature would have granted such powers to any board without using language which was so clear that there could be no question as to its intentions. The fact that the same act provides that, if the collector has failed to pay the money into the state and county treasuries, he shall be liable to a heavy penalty therefor, would indicate that one of the objects of the act was to refund the money if lands have been returned delinquent after the taxes had been paid thereon by the owner. The language "not liable to be sold for taxes" was, no doubt, intended to mean that where lands which, under the laws of that state, were exempt from taxation and yet were assessed and forfeited to the state for nonpayment of the taxes, as no title would pass to the state by the forfeiture, the purchaser should be recompensed by the return of his money.

In Hubbard v. Garfield, 102 Mass. 75, the board of assessors for a given year had struck off certain articles of property as not subject to taxation, and several years thereafter the board, composed of different individual members restored these articles of property to the tax list. The contention was that the action of the former board was conclusive, but the court said:

"The intention of the law is to be judged with reference to the nature of the proceedings which it affects and the character given to them by previous legislation, and with the aid thus derived, it is apparent that the assessors may add new names to the collector's list, as at least one legal mode of making the assessment. The mode would be less open to objection when the addition is made during the year by the same assessors and before the expiration of the collector's term of office, but the assessors constitute a tribunal with powers which imply a continual and uninterrupted condition not limited to the individuals who at any given time compose it. And if this were otherwise, the law in question expressly gives the power of reassessment to the assessors for the time being. If it be said that this construction gives to this class of town officers great power over the person and property of the citizen, the answer is that it is no more than must necessarily be had for the discharge of the important and difficult duties connected with taxation, and no more than has been exercised from the earliest time under existing laws."

The same conclusion was reached in Lemly v. Commissioners, 85 N. C. 379. In People v. Roberts, 155 N. Y. 408, 414, 50 N. E. 53, 55, 41 L. R. A. 228, the court, in speaking of the determination of assessing and taxing officers, say:

"We think there is no ground for holding that the action of mere assessing officers can determine that property is exempt from assessment for one year, and preclude the state as to the taxes imposed in succeeding years and prevent other officers from complying with the clear and plain requirements of the statute."

An act of the Legislature claimed to vest in any board the power to determine questions pertaining to the sovereignty of the state over

territory cannot be presumed to have been granted by a state, unless the language used is such that no other conclusion can be reached. As was said by the Supreme Court of the United States in Cumming v. Chicago, 188 U. S. 410, 430, 23 Sup. Ct. 472, 477, 47 L. Ed. 525:

"If it [Congress] had intended by the act of 1899 to assert the power to take under national control for every purpose and to the fullest possible extent the erection of structures in navigable waters of the United States that were wholly within the limits of the respective states, and to supersede entirely the authority which the states, in the absence of any action by Congress, have in such matter, such a radical departure from the previous policy of the government would have been manifested by clear and explicit language. In the absence of such language, it should not be assumed that any such departure was intended."

It is a well-settled principle of law that the state cannot be precluded by the laches of its officers from asserting any right or claim, nor is the state bound by the errors and mistakes of its officers in making settlements in its behalf. Cooke v. United States, 91 U. S. 389, 23 L. Ed. 237.

The opinion of the Attorney General of the state of Mississippi, while entitled to the highest respect, is not conclusive on that state or any of the courts. The instances in which the courts have declined to follow the ·construction placed upon statutes by Attorneys General of the United States or of the states are numerous, and the fact that the State Land Commissioner of that state declined to act upon that opinion, although given in response to his own request, clearly indicates that even executive officers in the state of Mississippi do not consider the opinions of the Attorney General as anything but advisory.

Upon the facts as found by the court in this case, there was no such acquiescence on the part of the state of Mississippi nor exercise of sovereignty by the state of Arkansas for such length of time as would warrant the court in holding that the state had lost its territory.

The finding being that the lands in controversy are not situate in the state of Arkansas, it follows as of course that this court is without jurisdiction to try the case on its merits, and the bill will be dismissed for want of such jurisdiction.